Weldon, J.,
delivered the opinion of the court:
On the 4th day of July, 1868, the United States entered into a convention with the Eepublic of Mexico for the appointment and organization of a commission to adjust and determine such claims of citizens of the United States against the Eepublic of Mexico and claims of citizens of said Eepublic against the United States, as had been presented to the Government of either party to said convention for its interposition with the other since February 2,1848, and which might be presented to *464 tbe commissioners to be appointed under said convention within eleven months from the day of their first meeting. By the terms of the treaty the awards of the commission, or of the umpire appointed byit, were to have theforceof absolute finality and conclusiveness and operate as a settlement of such claims. The treaty was ratified by both parties on the 1st day of February, 1869, and proclaimed by the President of the United States on the 1st day of February, 1869. (15 Stat. L., 679.)
The commissioners appointed by the respective parties held their first meeting on July 31,1869, and thereafter, in pursuance of the power vested in them, appointed an umpire.
The commissioners and umpire who finally acted upon the claim which is in controversy in this proceeding were Mr. Henry Wadsworth, on behalf of the United States, Señor Don Manuel Maria de Zamacona, on the part of Mexico, and the Bight Honorable Edward Thornton, K. O. B., envoy extraordinary and minister plenipotentiary to the United States of Her Majesty the Queen of Great Britain, as umpire. Mr. J. Hub-ley Ashton appeared as agent of the United States and Mr. Caleb Cushing as agent of Mexico. On or before the 30th of June, 1870, the United States, through their agent, presented to said commissioners, appointed as aforesaid, 873 claims aggregating the sum of $470,126,613.40 and 144 claims the amounts of which were not stated. The Bepublic of Mexico, through its agent, presented to the commission 998 claims aggregating the sum of $86,661,891.15. On the 19th of April, 1871, by a further convention, the time in which the commissioners were to decide claims was extended one year, and by further conventions the time was extended to the commissioners and the umpire until the 20th of November, 1876.
Pursuant to the power vested in the commissioners they made awards to the United States (including those awarded by the decisions of umpires) in the sum of $4,125,622.20, in favor of Mexico in the sum of $150,498.41, and the difference between said amounts was paid by Mexico to the Secretary of State in annual installments, as required by the several treaties aforesaid.
On the 17th of March, 1870, La Abra Silver Mining Company, by its attorneys, gave notice to the United States of the existence of a claim of the company against the Bepublic of Mexico for the sum of $1,930,000 for alleged damages and losses suf *465 fered by it in consequence of outrages and violence committed by tlie authorities of Mexico against the rights of said company in the years 1867 and 1S68; the notice was by the Secretary of State referred to said commissioners, and the company on the 14th of June, 1870, filed with the commissioners a memorial in which it is substantially alleged that m the year 1865, under and by act of the legislature of the State of New York, the said company became a body corporate; that said company was chartered for the “purchase of mines and mining, melting, dressing, smelting, buying and selling argentiferous and other ores, minerals, and metals;” that the stockholders were citizens of the United States, the amount of capital stock $300,000, and the existence of the company limited to fifty years; that part of its business, by the terms of its charter, was to be carried on outside said State, to wit, at Tayoltita, in the State of Durango and in the mineral district of San Dimas, both in the Republic of Mexico; that shortly after said incorporation the company purchased valuable mines and haciendas in the States of Durango and Sinaloa; that said mines purchased as aforesaid in Durango became and were known by the name of La Abra mines; that upon becoming the proprietors of said mines the said company proceeded with all possible dispatch to develop and improve the same; that in the purchase of the mine machinery and property incident to its successful operation the company invested the sum of $303,000, and that as a result of such improvement and expenditure it was getting out of said mines a large amount of rich ore, and was in the act of realizing a profit of $1,000,000 per annum, but it was compelled to abandon said mines by reason of the unfriendly and illegal acts and conduct of the officials of the Republic of Mexico; that intense prejudice existed in the public mind against all Americans; that such prejudice was intensified by the belief that the United States intended to annex said States to the dominion and territory of the United States; that the agents and servants of said company were arrested without cause and acts of violence committed against the property of the company which were encouraged by the authorities of Mexico; that the servants of the said company, while in the performance of their duty, were intimidated, killed, and driven out by the Mexican people; that the authorities made no effort *466 to protect the property of the company, and that the purpose was to obtain possession and control of said property.- It is further alleged that in consequence of such treatment the company was compelled to abandon its mine and other valuable property, which at the time of abandonment was worth to the company $3,000,030.
It is further alleged that at the time of the abandonment as aforesaid the said company was compelled to abandon 1,000 tons of ore, worth at the time the sum of $500,000, and which was wholly lost; that the profits of the company, if permitted to work the mines, would have been at the rate of $1,000,000 per annum; that in consideration of the premises the loss to the company is $3,000,030; that the whole amount of the claim belongs to the company; that it has not recovered any indemnity for said claim; that the claim was not presented prior to January 1, 1869, to the Department of State of either Government or to the minister of the United States at Mexico.
Such proceedings in relation to said claim were had as that the same was heard by the commissioners on the memorial and evidence aforesaid on or about the 19th day oí May, 1875; after hearing and considering the claim, said commissioners differed in opinion as to the allowance thereof, Commissioner Zamacona delivering his opinion that the claim should be rejected altogether, on the ground that the evidence in support thereof was insufficient, false, and in part procured by fraud, and that it was outweighed by the defensive evidence, and Commissioner Wadsworth delivering his opinion in the words and figures following, to wit:
“ The company in my opinion is entitled to indemnity for the seizures of its money, supplies, mule trains, and other property by the Mexican armed forces, under command of their officers, undoubtedly for the use of such troops, and for the destruction of the mining property and interests of the company by the various Mexican authorities, civil and military.
“ The amount of money seized and taken by force, according to the proof, as I read it, was altogether $2,978. The value of the several mule trains and supplies seized and appropriated for the public use I make, say, $75,000. The property and interests destroyed in addition, by the arbitrary, lawless, and malicious acts of the authorities, amounted to a large sum, difficult to estimate, but equal in my judgment to the total investment made by the company less the aggregate of the money, teams, and supplies taken as above stated.
*467 “ Upon these sums the claimant should have interest in lieu of prospective profits.”
# * $ * # * #
And thereupon, the claim was referred to Sir Edward Thornton, as umpire, for his decision upon the points of disagreement between the commissioners.
Thereafter, on the 27th day of December, 1875, he decided that the Bepublic of Mexico should pay, on account of the claim, the sum of $358,791.06, for the expenditures of defendant La Abra Siver Mining Company, with interest on said sum, and the further sum of $100,000 for the value of the unreduced ores alleged to have been extracted from said mines and abandoned by said defendant company, with interest on said last-named sum; and delivered his opinion in substance as follows:
“La Abra Mining Company v. Mexico, No. 489.
“AWARD OE THE UMPIRE.
“With reference to the case of1 La Abra Silver Mining Company v. Mexico,’ No. 489, the umpire is fully satisfied and can not doubt that the company is entitled to be considered a corporation, or company of citizens of the United States, in accordance with the terms of the convention of July 4,1868, having been duly chartered in conformity with the laws of the State of New York.
***#*##
“The evidence on the part of the claimants is, in the umpire’s opinion, of great weight; the witnesses are, for the most part, highly respectable and men of intelligence, and their testimony bears the impress of truth. Notwithstanding what is stated to the contrary by the witnesses produced by the defense, the umpire is constrained to believe that the local authorities at Tayoltita and San Dimas, far from affording to the claimants that protection and assistance which had been promised them by the Mexican Government, and to which they were entitled by treaty, not only showed themselves a spirit of bitter hostility to the company, but encouraged their countrymen who were employed by the claimants in similar behavior, and even frightened them into refusing to work for their American employers. The conduct of these authorities was such, and the incessant annoyance of and interference with the claimants was so vexatious and unjustifiable, that the umpire is not surprised that they considered it useless to attempt to carry on their operations, and that for this reason, as well as from the well-grounded fear that their lives were in danger, they resolved *468 to abandon the enterprise. These facts are not, in the umpire’s opinion, at all refuted or even weakened by the evidence submitted by the defense; on the contrary, he believes .that the local authorities were determined to drive the claimants out of the country.
“It appears that the superintendent of the mines took such steps as he could to obtain protection from these authorities, and finding his efforts in vain he appealed, through a lawyer of high character, to the highest authorities in the State, who declined to interfere in the matter. To suppose that, when so determined a spirit of hostility on the part of the local authorities (one of whom was the jefe politico, who wielded great power) and so much indifference by the State government were displayed toward the claimants, it would have been of any avail to appeal to the court of justice would be puerile. In short, the umpire does not see what else, in presence of such opposition to their efforts, the claimants could do but abandon the enterprise.
* * & * * * *
“A certain interest upon the money invested is a much surer compensation than prospective gains; the latter are, in fact, the interest upon the sums invested; they ma.y be greater or less or none at all, and there may be even great losses of capital. To award both interest and prospective gains would be to award the same thing twice over. The so-called value of the mines must depend upon the prospective gains. It may be great, small, or nothing, and may be but a mere snare to lead one on to utter ruin. It is, in the opinion of the umpire, equally inadmissible that the Mexican Government can be called upon to pay a value the amount of which, even approximately, it is impossible to decide. A moderate interest on the amount invested in the business and upon the amount of the ores reduced and of those extracted and deposited at the reduction works is a further compensation which, in the opinion of the umpire, that Government ought to pay.
“The evidence of George C. Collins with regard to the amount invested is clear and straightforward. He states it to be—
From subscriptions and sales of stock. $235,000.00
Lent and advanced. 64,291.06
Due for rent, expenses, salaries, law expenses. 42,500.00
341,791.06
“Any so-called ‘forced loans’ and contributions must have been paid out of this amount. To charge them, therefore, separately is to make the same charge twice over. The umpire takes occasion, however, here to observe that a forced contribution exacted upon a train of goods, the property of the company, in transit from a seaport or elsewhere to the mines is not *469 in tbe nature of a forced loan; tbe latter should be recovered by tbe proper authorities at tbe headquarters of the company, and should be in the same proportion as that imposed upon all tbe inhabitants of the country. Tbe former is an arbitrary exaction which is frequently much more prejudicial than the actual money loss, on account of tbe detention and abstraction of goods without which the mining operations can not proceed. To tbe above-mentioned amount of $341,791.06 should be added $17,000, which is shown to have been tbe amount derived from reduced ores.
“The umpire is satisfied, from the respectable evidence produced, that a large quantity of valuable ore had been extracted from the mines and deposited at the company’s mill, and that it was there when the superintendent was compelled, by the conduct of the local authorities, to abandon the mines and cease working them. But the umpire is of opinion that there is not sufficient proof, nor indeed such proof as might have been produced, that the number of tons stated by the various witnesses were actually at the mill, or at the mines, at the time of the abandonment. In so well regulated a business as the umpire believes that it really was lie can not doubt that books would have been kept in which the daily extraction of ores would have been regularly noted down, and that periodical reports would have been made to the company at New York. Neither books nor reports have been produced, nor has any reason been given for their nonproduction. The idea formed, even by persons intelligent in the matter, of the quantity of a mass of ore must necessarily be vague and uncertain, and that of its average value still more so. Still, the umpire is strongly of opinion that claimants are entitled to an award upon this portion of the claim.
“ He will put it at $100,000. It is possible that it is much less than the real value of the ores, but in the absence of sufficient documentary proof, and considering the fact that the expenses of reduction are great and sometimes even much greater than is anticipated, he does not think that he would be justified in making a higher award. Neither should interest be allowed on this amount so soon as on the others, for the reduction of the ores would have taken time — say a year. It is not shown that the company had received any dividends before the period of the forced abandonment of the mines, about March 20, 1868. Neither ought interest to be awarded before that date.
“ The umpire therefore awards that there be paid by the Mexican Government, on account of the above-mentioned claim, the sum of three hundred and fifty-eight thousand seven hundred and ninety-one Mexican gold dollars and six cents ($368,794.06), with an annual interest of 6 per cent from March 20,1868, to the date of the final award; and, further, the sum *470 of 0116 hundred thousand Mexican gold dollars ($100,000), with the same interest, from March 20,1869, to the said date of the final award.
“ Bdw. Thornton.”
Thereafter, on the 29th day of January, 1870, and the 19th day of September, 1876, Mr. Avila, agent for the Republic of Mexico, filed with the umpire a motion for a rehearing of the claim, on the grounds set forth in the opinion of Mr. Zama-cona, commissioner, as aforesaid, and on the further ground that the allowance of $100,000 with interest on the value of unreduced ores was invalid, because no allowance for the ores had been made by Mr. Wadsworth, commissioner, and the question of such allowance had not been referred to the umpire. But the umpire, on the 20th day of October, 1876, denied the motion for rehearing, and on the 20th day of November; 1876, the functions of the umpire terminated, as provided by the convention of April 29, 1876, aforesaid. By a decision of the umpire, dated July 31, 1876, that date was fixed as the date to which interest on all claims was to be computed; therefore the award on the claim of the defendant company, including interest, amounted to $683,041.32.
In the year 1877 the authorities of the Republic of Mexico were advised, as it is alleged, that certain testimony offered on the part of the company was false, and procured by use of money in the subornation of witnesses; and in that year were further informed that since the proceedings before the commissioners important and material testimony had been discovered, which, if presented to the commissioners and umpire, would have changed the result of the examination of the claim. On the 18th of June, 1878, Congress passed an act, chapter 262 (20 Stat. L., 144), directing the distribution of the fund paid by Mexico under the decree and judgment of the commission, but authorized the President to investigate any eharges of fraud presented by the Mexican Government with respect to the claim of said mining company; and if in the opinion of the President “the honor of the United States, the principles of public law, or considerations of justice and equity required that the award in the case of said mining company should be opened and the case retried, it should be lawful to withhold payment of the award to said conqiany until such case should be retried and decided in such manner as the Governments of *471 the United States and Mexico might agree, or Congress should otherwise direct.”
On the 8th day of August, 1879, in pursuance of the provisions of said act, the Secretary of State of the United States, in a report to the President, stated that the evidence presented by the Eepublic of Mexico in said claim brought in grave' doubt the truth of the evidence as to the amount of damages, and that the honor of the United States required a further investigation of the claim.
The Secretary further said :
“Third. The executive government is not furnished with the means of instituting and pursuing methods of investigation which can coerce the production of evidence or compel the examination of parties and witnesses. The authority for such an investigation must proceed from Congress. I would advise, therefore, that the proofs and conclusions you shall come to thereon, if adverse to the immediate payment on these awards of the installments received from Mexico, be laid before Congress for the exercise of their plenary authority in the matter.
“Fourth. It may be that, as the main imputation in the case of the La Abra Silver Mining Company is of fraudulent exaggeration of the claim in its measure of.damages, it may consist with a proper reservation of further investigation in this case to make the distribution of the installments in hand.
“I have this subordinate consideration still under examination, and, should you entertain this distinction, will submit my further conclusions on this point.”
The opinion was approved and adopted by the President, and thereafter, on the 3d day of September, 1879, the Secretary further reported to the President:
“The parties interested in the case of the La Abra Mining Company having desired from you a further consideration of the point reserved in my former statement to you of my views in that case, and the matter having been referred to me to that end, I respectfully submit my conclusion on that point.
“ 1. Upon a renewed examination of the matter as laid before me by the Mexican Government, I am confirmed in the opinion that the proper limits of the further consideration which the honor of the Government should prompt it to give to this award should confine the investigation to the question of a fraudulent exaggeration of the claim by the parties before the commission to which, under the provision of the convention, it was presented by this Government.
“2. Upon a careful estimate as to any probable or just reduction of the claim from further investigation, should Congress institute it, and under a sense of the obligation of the execu *472 tive government to avoid any present deprivation of right, wliicb does not seem necessary to ultimate results, I am of opinion that its distributive share of the installments thus far received from Mexico may properly be paid to the claimant, reserving the question as to later installments.
“ If this conclusion should receive your approval, the payment can be made upon the verification at the Department of State of the rightful parties to receive it.”
In pursuance of the recommendation of the Secretary there has been paid to said mining company and its assigns from time to time, until the amount received by the United States has been diminished to the sum of $403,030.08, which now remains in the possession of the Government.
Because of the alleged fraud against the justice and fairness of the award, an attempt was made to submit the question to anew convention; but the effort failed in consequence of the rejection of the treaty by the Senate. The matter being-unadjusted, and a portion of the money still remaining in the possession of the United States, in December, 1892 (26 Stat. L., 409), there was passed and approv ed an act in substance as follows:
AN- ACT to amend and enlarge the act approved J une eighteenth, eighteen hundred and seventy-eight, entitled “An act to provide for the distribution of the awards made under the convention between the United States of America and the Republic of Mexico, concluded on the fourth day of July, eighteen hundred and sixty-eight.”
“Whereas the Secretary of State, after investigating the charge of fraud presented by the Mexican Government as to the case of La Abra Silver Mining Company, has heretofore reported that the ‘honor of the United States requires’ that said case ‘should be further investigated by the United States, to ascertain whether this Government has been made the means of enforcing upon a friendly power claims of our citizens based upon or exaggerated by fraud,’ but that ‘the executive government is not furnished with means of instituting and pursuing methods of investigation which can coerce the production of evidence or compel the examination of parties and -witnesses,’ and that ‘ the authority for such an investigation must proceed from Congress;’ and
“ Whereas thePresident of the United States has transmitted to Congress the recommendation of the Secretary of State that said case ‘be referred to the Court of Claims, or such other court as may be deemed proper, in order that the charge of fraud made in relation to said claim may be fully investigated: ’ Therefore,
“Be it enacted by the Senate and Souse of Representatives of the United States of America in Congress assembled, That in *473 further execution of the purpose of said act the Attorney-General of the United States be, and he is hereby, authorized and directed to bring a suit or suits in the name of the United States in the Court of Claims against La Abra Silver Mining Company, its successors and assigns, and all persons making any claim to the award or any part thereof in this act mentioned, to determine whether the award made by the United States and Mexican mixed commission in respect to the claim of the said La Abra Silver Mining Company was obtained, as to the whole sum included therein or as to any part thereof, by fraud effectuated by means of false swearing or other false and fraudulent practices on the part of the said La Abra Silver Mining Company, or its agents, attorneys, or assigns; and in case it be so determined, to bar and foreclose all claim in law or equity on the part of said La Abra Silver Mining Company, its legal representatives or assigns, to the money, or any such part thereof, received from the .Republic of Mexico for or on account of such award; and any defendant to such suit who can not be found in the District of Columbia shall be notified and required to appear in such suit by publication as the court may direct, in accordance with law, as applicable to cases in equity.
“Sec. 2. That full jurisdiction is hereby conferred on the Court of Claims to hear and determine such suit and to make all interlocutory and final decrees therein, as the evidence may warrant, according to the principles of equity and justice, and to enforce the same by injunction or any proper final process, and in all respects to proceed in said cause according to law and the rules of said court, so far as the same are applicable. And the Secretary of State shall certify to the said court copies of all proofs admitted by the said mixed commission on the original trial of said claim, and the said court shall receive and consider the same in connection with such competent evidence as may be offered by either party to said suit.
# # # # # #
“Sec. 4. That in case it shall be finally adjudged in said cause that the award made by said mixed commission, so far as it relates to the claim of La Abra Silver Mining Company, was obtained through fraud and effectuated by means of false swearing, or other false and fraudulent practices of said company or its assigns, or by their procurement, and that the said La Abra Silver Mining Company, its legal representatives or assigns, be barred and foreclosed of all claim to the money or any part thereof so paid by the Eepublic of Mexico for or on account of such award, the President of the United States is hereby authorized to return to said Government any money paid by the Government of Mexico on account of said award, remaining in the custody of the United States, that has not *474 been heretofore distributed to said La Abra Mining Company or its successors and assigns, wbicli such court shall decide that such persons are not entitled, in justice and equity, to receive out of said fund.
“ Approved, December 28,1892/’
In pursuance of the provisions and powers of said act, the Attorney-General, on the 30th of March, A. D. 1893, in behalf of the United States, filed a bill of complaint, in which it is substantially alleged,inter alia, that the said company was not compelled by threats or acts of the Mexican officials or people to abandon its mines, as stated in the memorial of the company, as hereinbefore alleged; that said claim was a sheer fabrication, and that every substantial allegation in the memorial contained is false; that the material testimony on which the award was made is and was false; and that the whole of said award was obtained by fraud, effectuated by means of false swearing, subornation of witnesses, and other false and fraudulent practices. It is further alleged that in the year 1877 the Government of Mexico first learned of the existenceof a press-copy book containing letters and reports of the various superintendents of said company, and letters from the treasurer of said company showing that the company was in possession of its mine until August, 1868, and that at said time the said mines were abandoned because of a lack of means on the part of the company, and because the working of the same was unprofitable; that the said company did not quit and abandon said mines because of the illegal act of the officers of Mexico, nor because of the illegal interference of the people of said Government.
It is alleged that the United States has obtained from the Republic of Mexico the said press-copy book, affidavits, letters, and documents, and files the same as Exhibit B to said bill. In further extension of the general allegations of the bill the complainant specifically charges as follows:
“And your orator says that * * * Julius A. de Lagnel can and will, under oath, testify to the genuineness of the said press-copy book and of the letters of the said D. J. Garth, and to other important and material facts respecting the claim of said defendant La Abra Silver Mining Company; and that William P. Tuttle can and will testify to the genuineness of the said letters of the said Charles H. Exall; and that Charles B. Dahlgren, J. F. Gamboa, and J. M. Loaiza can and will tes *475 tify that the affidavits purporting to have been made by them in support of said claim were false and were obtained by fraudulent practices; and that Frederick Sundell, A. B. Elder, lla-món Hermosillo, Eugenio Somero, and Francisco Torres can and will testify that the material allegations of the said memorial and the material testimony submitted by said defendant company in sppport of said claim are false. And your orator says that the said documentary evidence and the said witnesses will enable your orator conclusively to show the facts in the fifteenth paragraph of this bill alleged, and also the following, which your orator says are the facts, to.wit:
“ That there was no hostility toward said defendant La Abra Silver Mining Company on the part of Mexican officials or people, but that, on the contrary, their relations to its officers were friendly; that ‘prorogas,’ or extensions of title, were frequently granted to said company, and that said company received from officers of the republican army special military protection for its property and for the mule trains belonging to contractors with said company during the war between the Republican Government of Mexico and the Imperialists. * * *
“That the superintendent was not imprisoned, but only told to consider himself in arrest (at his own hacienda) for alleged contemptuous treatment of a judge, and that he straightway. complained to the prefect, after which no further restraint was imposed upon him. That no redress was denied the officers of the company, and no wrongs were inflicted upon them. That the officers of the company paraded their rights as American citizens, and Superintendent Bartholow proposed, if certain taxes were imposed upon him, to hoist the American flag, and to have them taken from under it by the military, the result of which threat was, as he explained it to Treasurer Garth in his letter of April 10, 1866, that instead of paying three or four thousand dollars he only paid thirty. That when Garth instructed Superintendent Exali, in his letter of July 10,1867, to be firm in maintaining his rights as an American citizen in any difficulties with the authorities, the latter replied, on the 6th day of October, 1867: ‘ There is no difficulties about authorities, boundaries, or anything else concerning the mines and hacienda provided there is money on hand, and money must be sent.’
“That as early as May, 1867, the said Garth, treasurer of said company, advised Superintendent Exali, at the mines, that no more money could be sent him by said company; that a draft on said company for §5,000, drawn by Superintendent De Lag-nel through the Bank of California-, had been protested, and that the said Exali must pay all expenses from the-proceeds of the mines. And in July, 1867, the said Garth wrote the said Exali: ‘If it costs more than it comes to, the sooner we find it out the better, and the sooner we stop the better for all parties concerned.’
*476 “ That the ores extracted from the said mines were worthless, the only reduction made being of 90 tons in August, 1867, and yielding less than $5 per ton, which was not enough to pay the cost of mining, and the rest being so poor that, according to Exall’s report of October 6,1807, it would not ‘ pay to throw it in the river.’ That for this reason, if for no other, they were not carried off by Mexicans, and are still at the mines. * * *
“That the said Granger remained in charge of the said mines and property until after August 12, 1868, on which date he advised the Mexican collector of taxes that there were neither money nor effects to pay taxes on said mines, but that the superintendent would return in November, 1868, when the same would be paid.
“ That the said Exall and the president of the said defendant company, George C. Collins, and the first superintendent of the said defendant company, Thomas J. Bartholow, grossly and fraudulently misstated and exaggerated, in their affidavits made in support of said claim, the amount of money expended by said defendant company in the purchase and operation of its mines and property, and that said defendant company expended in such purchase and operation much less than $200,000.
« # * * * _ # #
“That the investment of said company derived from reduction of its ores was only $420.09 instead of $17,000, as sworn by the said Exall and allowed by said umpire in his said award.
“That instead of the unreduced ores extracted by said defendant company and abandoned at its said mines being-worth $100,000, as estimated by the said umpire, from conflicting statements of witnesses for said defendant company and allowed by the said umpire in his said award, said ores were absolutely worthless and would not pay the cost of reduction.
“That the affidavits of said J. F. Gamboa and said J. M. Loaiza so as aforesaid made in the month of May, 1870, and submitted to said commission by said defendant company, were false, and were procured by bribery and other unlawful means by the agent of said defendant company. And that the affidavit of the said Charles B. Dahlgren, as the same was submitted to said commission by said defendant company, was false, and was not made by the said Dahlgren.
***#*##
“ To the end, therefore, that the said defendants may, if they can, show why your orator should not have the relief hereby prayed, and that they and each of them, on oath, may full, true, direct, and perfect answer make to the matters and things aforesaid, and that as fully as if the same were here again repeated and they thereunto severally interrogated paragraph by paragraph.
*477 “And that the said defendants and each and every of them may be compelled to disclose as aforesaid.
“And that the said defendants and each and every of them may, by the decree of this honorable court, be forever restrained and enjoined from setting up any claim to any part of said award or of the moneys now, as aforesaid, in possession of your orator.
“And that the said award on the claim of the said defendant La Abra Silver Mining Company may, by the decree of this honorable court, be declared to have been wholly obtained by means of false swearing and other false and fraudulent practices on'the part of said defendant company, its agents, attorneys, and assigns.”
To the bill the defendants filed a demurrer; but “ not confessing all or any of the matters and things in the complainants’ bill of complaint alleged.” In connection with that reservation as to the truth of the allegations of the bill the defendants said for cause of demurrer in substance that by the Constitution the subject-matter of the complainants’ suit is not within the jurisdiction of this court or of any court of the United States, but is within exclusive control of the Executive Department; that the question whether the award was obtained in whole or in part by fraud, and the question whether the whole or any part of the money should be returned by the President to Mexico, are not competent, fit, or proper to be considered and determined by this court, or by any municipal court, but the said questions are diplomatic or political, and Congress has no power to authorize a court to consider said questions as against the powers and discretions appertaining to the Executive Department of the Government of the United States; that, the United States have no such interest in the matters alleged in the bill as will enable them to maintain this suit or entitle them to the relief; that the Government of Mexico is the party interested in this suit, and at all times since the discovery of the alleged frauds and injuries set forth in the said bill of complaint the said Government of Mexico has had a remedy by suit against the alleged wrongdoers in the courts of the United States for the annulment of the said award; that by failing to prosecute such suit the Government of Mexico has been guilty of laches, and has forfeited all rights to relief in equity, and that therefore the United States are not entitled to demand such relief for the benefit or in the interest of Mexico in this suit.
*478 It is further averred that the mixed commission which met under the treaty of July 4, 1868, is recognized by the law of nations and by the Constitution and laws of the United States as a court of exclusive and final jurisdiction, and that an award of such a commission is recognized by the law of nations and by the Constitution and laws of the United States as a judgment of a court belonging to the judicial system of the Government of the United States and can not be set aside by a municipal court of the United States; that Congress can not grant a new trial in respect to matters determined by arbitration under such a treaty. Such an award can, on the part of the United States, be reopened only by action of the treaty-making power of the Government, and that the question presented by the complainants’ bill is res judicata: that it appears on the face of the bill that the question is the same question that was tried by the commissioners under the treaty of July 4, 1868j such fraud and fraudulent practices having-been charged by the Mexican agent and commissioner at the trial is res judicata, and can not be reexamined and redetermined by this honorable court.
It is also alleged that the act of Congress under which this suit is prosecuted is unconstitutional on the further grounds that it assumes and undertakes to direct, control, and bind the courts .in adjudicating the question submitted for the final adjudication of the courts named in the act; to receive evidence and apply legal principles to the said adjudication which are erroneous and wholly inadmissible according to law as administered in the courts of the United States in like cases; and such act undertakes to prescribe to the courts what weight and effect they shall give to the evidence, and how the courts shall reach the conclusion that said award was obtained in whole or part through fraud; that inasmuch and because the questions presented by the complainants’ bill are of a political and diplomatic nature, and not justiciable, or fit and proper to be considered and finally determined by a municipal court, Congress can not impose upon this honorable court, or upon the Supreme Court of the United States, or upon the judges thereof, the trial and determination of such questions. It is also alleged that the act of Congress is void on the further ground that it was never approved by the President of the United States as required by law, the only alleged approval *479 wbicb it ever received being on tbe 28th of December, A. D. 1892, when Congress was not in session, both Houses of Congress having adjourned on the 22d of December, A. D. 1892, to the 4th of January, A. D. 1893; that the complainant’s bill of complaint does not set forth facts sufficient to constitute a cause of action or to warrant this honorable court, in granting any relief in the premises.
After very elaborate argument and mature consideration by the court, the demurrer was overruled and leave given to the respondents to answer by the 1st day of July, 1894. In the conclusion of the opinion of the court upon the demurrer it is said: .
# *####*•
As there is no express provision for a decree in favor of the defendants, it is objected to the statute that in that particular it is defective in the requirements of a constitutional law.
The scope and purpose of the act is to submit to the decision of the cour’t the question as to whether the award was obtained “by fraud effectuated by means of falseswearing or other false and fraudulent practices;” and if the issue is found for the United States, then, as a result of that finding, the President is authorized to return the money, but if the issue is found for the defendants as to the money, or a severable part of the same, then it would be the duty of the Secretary of State to proceed to distribute so much of the award as shall be found not obtained by fraud.
The directions of the statute as to the character of the decree seem to be without doubt, and as the court in the trial of the cause is in the exercise of equity powers, it will find no difficulty in entering such a decree as will carry out the purpose of the statute. If the court should decide that no fraud ' or fraudulent practice was perpetrated by the company in procuring the award, then the decree should specifically find that fact, which would be in law a finding for the company, and upon that finding in the form of a decree it would be the duty of the Secretary of State to pay the money to the company or its assignees. * * * Assuming as true (as we are authorized by the demurrer) the charges of the bill constituting the alleged fraud, the court overrules the demurrer on the question of jurisdiction and the sufficiency of the bill, and leave is *480 granted respondents to answer or plead if they so desire by tbe 1st day of July.” (29 C. Cls. R., 432.)
In pursuance of tbe power given by tbe decision of tbe court on tbe demurrer, tbe respondent filed an answer on the 31st day of May, A. D. 1894, in which it is admitted that tbe allegations in tbe first, second, third, fourth, and fifth paragraphs of tbe bill are true as therein alleged. Tbe sixth paragraph is admitted with certain qualifications. Tbe seventh is admitted, subject to tbe denial that tbe umpire was confined to tbe points in dispute between tbe American commissioner and tbe Mexican, but insists that be bad tbe power to dispose of tbe claim “according to bis views alone.”
Tbe respondent further answering admits paragraph eight, in which is alleged tbe finding and award by tbe umpire, and substantially admits tbe allegation in paragraph nine as to tbe motion for a new trial and tbe denial of tbe same, but refers to said motion as a more accurate statement of tbe grounds on which motion was.denied.
Tbe respondent as to the tenth paragraph admits tbe statements therein contained as to tbe gist and gravamen of tbe claim, but denies all allegations of fraud and deception on tbe part of tbe company; denies tbe suppression of proof, papers, and testimony as to tbe treatment by tbe Mexican authorities.. Tbe answer alleges that tbe company’s books and papers showing its expenditures and losses were left at Tayoltita, in tbe jurisdiction of Mexico, with all other property of the company, and came into tbe possession of Granger, a British subject, who is tbe same person from whom tbe Mexican Government, in 1877, is alleged to have recovered certain books and papers, letter-press copy, and original letters; that Granger bad been employed by tbe company as its bookkeeper.
It is further alleged that tbe price paid for tbe mine and the-expenditures of tbe company were established by tbe testimony of witnesses offered by tbe Mexican Government, as well as by witnesses offered on tbe part of tbe defendants.
Tbe respondent admits that in June and August, 1877, tbe Government of Mexico procured affidavits of Gamboa, Loaiza, Sundell, and Granger and other persons, tbe press-copy book, and alleged original letters, and that tbe same were forwarded as therein alleged.; but denies that tbe contents of such letter *481 book and letters are correctly set forth in the eleventh paragraph; denies the proof of said affidavits and all statements in alleged copies of Exall letters contained in the press-copy book; alleges that said affidavits were procured from said parties by intimidation and duress upon the part of the Mexican Government; that the testimony of said witnesses could have been procured while the claim was pending before the Commission, and that the affidavits were false and untrue. Then follow allegations as to what was done by respondent after the said affidavits were procured and filed in the State Department, but it is not necessary to quote them in this connection.
The respondent admits the allegation of the twelfth paragraph as to the act of Congress, but denies the allegation that the defendants had purposely refrained securing and offering-on the trial before the Commission the testimony of Julius A. de Lagnel, who had been one of the superintendents of said mine; admits that the Mexican Government procured the affidavit of De. Lagnel, but denies that he identified the press-copy book as genuine. Then follow allegations of an affirmative character, going to the gist of this controversy as presented by the material allegations of the bill.
The respondent admits the allegations of the thirteenth paragraph as to the passage of the resolution of the Senate of August 30,1888, and the report; made on the 1st day of March, 1889, by the Committee on Foreign Eelations, as alleged in said paragraph, but denies the truth and correctness of the statement in the quotation as to the abandonment of the mines by the company because of their unproductiveness, and, on the contrary, alleges the great value and productiveness of the mines.
The respondent admits the passage of the act of December 28,1892, by which the Attorney-General is authorized to bring suit, but alleges the invalidity of said act because of the approval by the President during a recess of Congress, and for the further reason that the subject-matter is not within the jurisdiction of a municipal court; that the United States have no pecuniary interest in the subject-matter, and therefore can not be a plaintiff, and that the Mexican Government is not entitled to the benefit of a suit in equity when brought in the name of the United States; that the Mexican Government *482 should have prosecuted the alleged false witnesses for perjury, and should have brought suit in the courts of the United States against this defendant to set aside said award.
The fifteenth allegation of the bill is as follows:
“Tour orator further shows that, in fact, the said defendant La Abra Silver Mining Company was not compelled by threats or acts of Mexican officials or people to abandon its said mines, as stated in said memorial and in the proofs submitted by said defendant company in support of its said claim, on or about the 20th day of March, 1868, or at any other time, but that said claim was a sheer fabrication, and every material allegation in said memorial contained was a falsehood, and that all the material testimony upon which said claim was allowed and said award was made was false, and known to be so by all the witnesses giving and swearing to the same and by the said defendant company, when it caused the same to be exhibited as true to said commissioners, and that the whole of the said award was obtained by fraud effectuated by means of false swearing, subornation of witnesses, and other false and fraudulent practices on the part of the said defendant company, its agents, attorneys, and assigns.”
To that paragraph the respondent, answering, says: “The defendant denies each and every allegation in the said fifteenth paragraph of said bill of complaint.”
As to the sixteenth paragraph, the respondent admits that complainants are in possession of press-copy and documentary evidence, but insists that the originals should be filed with the bill, so that it may examine them. Respondent denies each and all of the allegations in said paragraph contained, and alleges that Exall, shortly before he abandoned the mine, was imprisoned by the local Mexican magistrates without warrant or authority.
The respondent admits that it entered into a contract with A. W. Adams, as alleged, but denies that Adams with the knowledge and consent of the respondent obtained false, fraudulent, or corrupt testimony from any witness in support of the claim; admits assignments, except to the late Samuel C. Pomeroy. As to other allegations of said paragraph, neither admits nor denies, but insists on on strict proof.
The respondent admits that it claims, as alleged in the nineteenth paragraph, that it is the duty of the United States to pay the remaining proceeds of said award to the respondent, and further denies all allegations of fraud, conspiracy, or cor *483 rupt and fraudulent practices contained in the allegations of said bill.
It must be conceded that the fifteenth paragraph of the bill, by its general allegations, presents the substantial issue in this proceeding; and if those allegations are sustained, the complainants are entitled to decree as prayed for in the bill. If, upon the other hand, it is shown by the proof that the company was compelled to abandon its mines, as alleged in its memorial to the commission, and that it has only recovered what in fact it suffered in a loss of property, then the award is to stand, and the respondent .is entitled to a decree to that effect.
As was said by this court in overruling the demurrer:
“ The case is to proceed upon ‘ the proof admitted by the mixed commission in connection with such competent evidence as may be offered by either party,’ and the court is to consider the whole evidence in arriving at a conclusion as to whether the finding of the commission was procured by fraud on the part of the company.” (La Abra, 29 C. Cls. R., 521.)
The court further said:
“ If the court, upon an examination of the cause, in the light of the original proof and such competent evidence as may be offered, should come to the conclusion that the award by the Commission was obtained through fraud effectuated by false swearing or other false and fraudulent practices of said company, then it will be the duty of the court to decree that the company, its legal representatives and assigns, be barred and foreclosed from all claim to the money, or part thereof, so paid by the Eepublic of Mexico; and upon the faith of that finding (subject to an appeal to the Supreme Court of the United States), the President is authorized to return to the Government of Mexico the money still remaining in the custody of the United States. * * *
“ If the court should decide that no fraud, or fraudulent practice was perpetrated by the company in procuring the award, then the decree would specifically find that fact, which would be in law a finding for the company, and upon that finding in form of a decree, it would be the duty of the Secretary of State to pay the money to the company or its assignees.”
The respQndent having an award of the umpire, is entitled to the full benefits of that award, unless it is shown by sufficient proof that within the meaning of the statute giving this court jurisdiction the award, or some substantial part thereof, was obtained “by fraud, effectuated by means of false swearing or other false and fraudulent practices on the part of said *484 company or its agents, attorneys, or assignees.” The burden is upon the complainants to satisfy the court that the award made by the umpire was the result of fraud as indicated by the statute. We are not sitting as a court of review to determine whether, upon the proof offered and admitted, the award is to be sustained or justified by the weight of testimony, but whether it was procured by false testimony or fraudulent practice upon the part of the respondent. We are not to determine the question as to whether the umpire found against the weight or great weight of the evidence, but whether the award is the result of fraud and perjury upon the competent testimony.
The pleadings reduced to their logical results, and the scope of the testimony circumscribed to its proper limits, bring the contention of this voluminous case to the compass of the fifteenth paragraph of the bill, which in substance is that the respondent was not compelled by threats and acts of the Mexican officials and people to abandon its mines on or about the 20th of March, 1868, as stated in the memorial and the proofs submitted by the company in support of the claim; that said claim was a sheer fabrication; every material allegation was a falsehood; that the award was procured and obtained upon false and perjured testimony; that such falsity was known to the company when the claim was presented to the Commissioners, and that the whole of said award was obtained by fraud, “ effectuated by means of false - swearing, subornation of witnesses, and other false and fraudulent practices on the part of said defendant company, its agents, attorneys, and assigns.”
The general statement of this paragraph, taken in connection with other portions of the pleading more specifically charging the fraud, may be treated as the embodiment of the issues to be determined in this proceeding.
In the answer of the respondent to the allegations of the fourteenth clause of the bill as to the passage of the act giving the court jurisdiction, the question of the validity of the act, both as to its subject-matter and the manner of its approval by the President, is raised by the respondent.
The question of the validity of the law under which the.bill was filed was fully argued on the demurrer and determined by the court in its opinion overruling the same; and while the *485 jurisdiction of tbe court as to tbe subject-matter of a proceeding may be raised in any state of tbe litigation, we are not now disposed to reexamine tbe question of tbe validity of tbe act of 1892, but rely upon tbe legal principles announced in our former decision. (United States v. La Abra Mining Company et al., 29 C. Cls. R., 433, and United States v. Alice Weil et al., 29 C. Cls. R., 523.)
It is also insisted upon tbe part of tbe respondent that, tbis proceeding being in the nature of a suit in equity based upon tbe judgment of a tribunal having complete jurisdiction of tbe parties and subject-matter, tbe complaints must show such a state of facts a.s would justify a court in granting a rehearing or new trial; that if the party in interest, to wit, tbe Government of Mexico, has been guilty of laches and want of diligence in theqnesentation of its defense, it is now too late for it to avail itself of any defense which by tbe exercise of proper diligence might have been presented to tbe joint commission. Tbe question of diligence upon tbe part of Mexico is not, as we conceive, before tbis court. That question was passed upon by Congress in tbe passage of the law giving us jurisdiction to determine the controversy on the questions of fact, subject to tbe rules of evidence applicable to tbe character of tbe inquiry arising upon tbe record. We simply come to a conclusion as to tbe material inquiries arising under the statutes on tbe evidence properly before us, and upon that conclusion base tbe legal result in tbe form of a decree.
Tbe supplemental brief of counsel for tbe respondents calls the attention of tbe court to tbe sixteenth volume of tbe American and English Enclycopedia of Law, page 566, where it is said, “ As a general rule it may be said that a new trial will not be granted on tbe ground of newly discovered evidence, or where the new evidence is that of a witness who has been examined on a former trial.” Also tbe case of State v. Dorsey (La., 1890), 7 S. C. Rep., 326, in which it is said, “Where a witness was summoned by tbe applicant (for a new trial) and was present at a former trial but was not interrogated, his testimony can not be relied upon as a ground for a new trial.” So in Poullain v. Poullain (79 Ga., p. 11).
We are also cited to tbe case of Stearns v. Page (7 Howard, p. 829; L. Ed. Book 12, p. 923), requiring a specific statement of fraud, bow, when, and in what manner it was perpetrated.
*486 The decision of the court on the demurrer determined the sufficiency of the bill, and, as we have said, Congress in the passage of the law determined the legal question as to whether there should be a reexamination of the claim and a retrial of the 'cause.
In the memorial before the Mixed Commission, and which is the foundation upon which this proceeding is based, it is in substance alleged (after stating the purchase and the continuous success of the enterprise) that the company was compelled to abandon the mine by reason of the unfriendly acts and conduct of the officials of the Republic of Mexico; that the agents and servants of said company were arrested without cause, and acts of violence were committed against the property of the company which were encouraged by the Mexican authorities; that the servants of the company were killed and driven out by the Mexican people; that the authorities made no effort to protect the property of the company, and that in consequence of such treatment it was compelled to abandon its mines and other valuable property, which at the time of such abandonment was worth the sum of $3,000,000.
Having decided that under the law of 1892 the court has jurisdiction, notwithstanding the very able arguments of counsel to the contrary, to inquire into the fairness and justice of the award, we now reach that part of the case when it is necessary for us to determine from the testimony., first, whether the respondent was compelled by threats or acts of the Mexican officials or people to abandon the mine, as stated in the memorial, on or about the 20th of March, 1868, and if so, what was the reasonable value of the property so abandoned because of the failure of the Mexican officials to afford protection to the company in the prosecution of its enterprise as indicated by its ownership and extent of its property.
The proceeding authorized by the statute giving the court jurisdiction is not strictly in the nature and character of an ordinary new trial at common law, nor of a proceeding in the nature of a bill of review in equity, as we are not authorized to disturb the award upon the ground of the insufficiency of the testimony appearing in the record before the Commission and upon which the award was based.
It must be assumed that such proof, uncontroverted and unimpeached, was sufficient to justify the umpire in making the *487 allowance, and unless we are satisfied from tbe newly discovered evidence that tbe award is based upon false testimony effectuated by acts of the company, then such award must stand and be enforced against tbe Government of Mexico in tbe payment of tbe residue of tbe money.
If tbe testimony on which tbe award was procured was false and obtained as indicated by tbe terms of tbe law, it must be admitted and assumed that such falsity was known to tbe company through its agents and that in this proceeding tbe company is responsible for such falsity.
If tbe respondent was not compelled to abandon its property because of tbe violence of tbe Mexican people and authorities aud tbe failure of tbe Mexican Government to protect it in tbe enjoyment of its mines and its incident plant, then it is not material what may have been its loss because of an abandonment.
Tbe testimony on this branch of tbe case, including what was before tbe Commission and which has been taken and offered since in this proceeding, is voluminous and very contradictory.
Exhibit A contains tbe testimony submitted by both sides while tbe controversy was pending before the Commission; Exhibit JB contains tbe evidence submitted to tbe Secretary of State upon which be reported to tbe President that it brought ■ into grave doubt tbe sincerity of tbe evidence as to tbe measure of damages insisted upon; Exhibit 0 contains tbe evidence taken by tbe complainants; Exhibit D is tbe evidence taken by tbe respondent since tbe commencement of this proceeding, and Exhibit E is tbe testimony taken by tbe committee of the Senate under tbe resolution of August 30,1888, authorizing an examination of tbe claim by the testimony of witnesses under oath.
Certain books and excerpts were offered in evidence during tbe trial which appear in tbe record. By tbe agreement of tbe parties tbe evidence taken by the committee of tbe Senate was admitted, subject to objections to certain portions of it which might be pointed out on tbe trial. Tbe matters contained in Exhibit B, purporting to be letters from tbe letterpress books of tbe company, are substantially established by tbe introduction of tbe original book referred to in tbe application of tbe Government of Mexico to tbe Secretary of State *488 asking a reinvestigation of tbe claim and which was used in the investigation of the Senate.
These exhibits indicate the broad range of testimony from which must be deduced the conclusions of fact upon which the decree of the court is founded. Much of the testimony on both sides is contradicted by the testimony on the other, and the two main issues of the case are subjected to evidence unsatisfactory and suspicious. The evidence before the umpire was, in the judgment of the distinguished gentleman who acted as such, sufficient to justify the allowance of an award which amounted to nearly $700,000 and which by this proceeding is attacked upon the ground that it was procured by testimony false in character and known to be so by the respondent. Under an allegation of that kind it is not strange that the record abounds in conflicting testimony on the material issues of the case, and it is impossible to reconcile the disagreement of witnesses upon any theory of honest mistakes or failure of recollection. It is impracticable in an opinion to deal with such a record in detail. We must therefore content ourselves with calling attention to the material points of the evidence and rely on them in connection with the other proof as indicating the probable truth of the controversy.
A question of the construction of the law giving the court jurisdiction may arise as to the extent and power of the court in the investigation as affecting the whole or a part of the award. The theory upon which the Secretary of State acted in his consideration of the alleged grievance of Mexico was that the examination might properly be confined to the question of “ fraudulent exaggeration,” and not involve the question as to the right of the company to recover because of the alleged interference of the people in the affairs of the company and its property, the failure of the Mexican authorities to protect the company from such interference, and the violation of their obligations to the property rights of the respondents.
The theory which we have adopted is that the examination under the statute of 1892 properly embraces the inquiry as to whether the company was compelled to leave Mexico because of the acts of the people and the authorities j and if so, tlie value of the property abandoned and sacrified.
The recital in the act of 1892 is that the Secretary of State, as heretofore, reported that the honor of the United States *489 requires that said case (La Abra Silver Mining Company) “should be farther investigated by the United States to ascertain whether this Government has been made the means of enforcing upon a friendly power claims of onr citizens based upon or exaggerated by fraud.”
By the provisions of the statute it is made the duty of the Attorney-General to bring suit In the name of the United States in the Court of Claims against La Abra Silver Mining Company, its successors and assigns, “ to determine whether the award made by the United States and Mexican Mixed Commission in respect to the claim of the said La Abra Silver Mining Company was obtained as to the whole sum included therein, or as to any part thereof, by fraud effectuated by means of false swearing or other false and fraudulent practices on the part of the said La Abra Silver Mining Company, its agents, attorneys, or assigns j and in case it is so determined, to bar and foreclose all claim in law or equity on the part of the said La Abra Silver Mining Company, its legal representatives or assigns, to money or any such part thereof received from the Republic of Mexico for or on account of such award.”
The fourth section in substance provides that in case it shall be adjudged in said cause that the award made by said Mixed Commission was obtained through fraud effectuated by means of false swearing or other false and fraudulent practices of said company or its assigns, or by their procurement, the said company, its legal representatives or assigns, be barred and foreclosed of all claim to the money or any part thereof so paid by the Republic of Mexico for or on account of said award. While the fourth section of the statute, which provides as to the decree in case the cause should be adjudged against the company, is not as broad in its phraseology as that portion of the statute which gives the court the right to inquire into the alleged fraud, the evident purpose is that the whole matter be subject to the jurisdiction and investigation of the court to determine as to whether all or any portion of the sum was procured through fraud and false swearing by the agency of the company, its representatives or assigns. The object of the statute being to investigate as to the award, the resulting power of the court based upon that grant of jurisdiction must be held and construed to be sufficiently broad to carry out and effect the purpose of the statute.
*490 The testimony contained in Exhibit B (which embraces in substance the evidence submitted to the Secretary of State, and which brought into grave doubt, as he said, the sincerity of the evidence as to the measure of damages,.which was before the Senate in the investigation under the resolution of •August 30, 1888, and which was also before Congress at the time of the passage of the act giving jurisdiction to this court to investigate the justice and fairness of the claim) embodies the letters offered in evidence as appearing in the letter-press book of the company, and to these letters the respondent objects upon the ground of incompetency.
Many cases have been cited to sustain the legal force of such objection. Our attention has been called to section 309 of Angelí on Corporations as an epitome of the decisions on the question of the power of an agent, the substance of which is that the declarations and admissions of the agent must be within the scope of the authority conferred on him and must accompany the act or contract which he is entitled to do or make.
In the case Langhorne v. Alnutt (4 Taunton Reports, p. 511), which was a suit on two insurance policies, certain letters were offered in evidence written by an agent which were under the circumstances of that case held to be incompetent. Chief Justice Mansfield said: “ It is unnecessary to go into all the cases where letters of the agent have been received or rejected. The master of the rolls in the case of Fairlie v. Hastings (10 Vesey, 123) has gone into some of them; but it suffices to say that these lettert are not a part of the res gestae, not letters written in the course of transaction and forming no part of it, but a mere narrative.”
It was held by a concurrence of the judges in that case that the letters written by an agent to his principal, in which he rendered an account of his transactions, are not admissible unless they were a part of the res gestae.
The same doctrine was announced in the case of Rayner v. Pearson (4 Taunton Reports, 662) in affirming the case of Langhorne v. Alnutt.
In the case of In re Del Prov. Gold Mining Company, chancery division of the supreme court of judicature (22 vol., 593), a shareholder in the company sought to have his name removed from the register of members on the ground that he *491 bad been induced to become a member by misrepresentations of a prospectus issued by the company. The only evidence relied upon as tending to prove the misrepresentations was a speech made by the chairman to the stockholders in a meeting held by them. The'court decided that the statements of the chairman were inadmissible against the company, for the reason that the chairman was not acting as an agent of the company in a transaction between the parties, but making a confidential report to his own principal.
In the case of Carroll v. East Tenn., Va. and Ga. R. R. Co. (82 Ga. Reports, 452) it is held in substance, that reports to the general manager touching the facts of a railway accident, and as to who was to blame for it, made several days after the event by the superintendent and conductor, are not admissible against the company in a suit for damages.
In the case of Betts v. Farmers’ Loan and Trust Co. (21 Wis. Rep., 80) it is decided that a letter written by the assistant superintendent of the road to the station agent, relieving him upon the ground of negligence, was not evidence of an admission of negligence by the defendant.
In The City Bank of Baltimore v. Bateman, Harris, and Johnson (Md. Reports, vol. 7, p. 104) it is held in substance that the president of the bank, as agent of the corporation, any act done by him in pursuance of and coextensive with his authority, would bind the corporation, but declarations not making part of the res gestae, and being representations only of his own mere authority of what was done, could not be received in evidence against the corporation.
The controversy in this proceeding, so far as the parties in interest are concerned, is between the respondent, La Abra Silver Mining Company, and the Mexican Government, upon a condition which is alleged to have existed at the mines of the company in the State of Durango and other places, in the. Republic of Mexico, commencing in the year 1865 and extending into the year 1868.
It is not a controversy as to contractual rights and legal obligations arising from relations of commercial intercourse, but originated from alleged wrongs and injuries to the property rights of the company, because of alleged violence of the people of Mexico, the public authorities, and the failure of the *492 Mexican Government to protect the agents, servants, and property of the company.
It maybe said the res gestee of the controversy is the condition of the company during that period, so far as the same was affected by the people of Mexico and the acts of the public authorities, and the consequent effect upon the property rights of the company, because of the acts of the Mexican people and the alleged failure upon the part of the Mexican Government to protect and preserve from popular violence the agents, servants, and property of the company.
The company, although organized under the laws of New York and having its principal office in the city of New York, was instituted mainly for the purpose of carrying on the business of mining in the State of Durango and other places, and as a result of that purpose its property and field of practical life and existence were at the mines belonging to it in Mexico.
It had no substantial existence except in legal contemplation at any other point. While the general policy of administration was determined in the city of New York by its board of directors, its practical life and existence were conducted by its superintendents at the mines, who controlled and directed the business from which success or failure was to come. Those superintendents were in law and in fact, from the necessities of the situation, general agents, having full control of the business of the company and dealing with the property and rights of the company on the broadest basis of authority. Their relations of responsibility, confidence, and trust were commensurate with their power as agents. The business outside of the general policy of the company was all in their hands, and all knowledge'of conditions and prospects came to the home office in and through the medium of their communications. They were assumed to have the ability of management and were thé only source of knowledge of conditions accessible to the board of control in the city of New York. They and their subordinate servants were the embodiment of the company in the field of active operations and at the point where the corporate existence of the company come in contact with the practical purposes of its functions.
Aside from the actual direction of the business of the company in the management of its interest at the mines, the next important duty of the agent was to communicate with the *493 officers of the company in tbe city of Hew York, so that they might be reliably,advised of the affairs of the company at the most material point of its existence. In this connection may be quoted the general principles as gleaned from the highest authorities on the subject of agency, as found in Ewell’s Evans on Agency (p. 440): “A principal is liable to third parties for whatever the agent does or says, whatever contracts, representation, or admission he may make, * # * provided the agent acts within the scope of his apparent authority, and provided a liability would attach to the principal if he were in the xilace of the agent.” That is fundamental law, supported by authorities too numerous to mention. (Hanover R. R. Co. v. Coyle, 55 Pa., 402; Harriman et al. v. Stowe, 57 Mo., 96.)
The letters to which objection is made are letters commencing during the time of the first superintendent and extending through the agency of two others until after the time it is alleged the company was compelled to leave Mexico in consequence of the violence of the people and authorities.
In this connection it may not be amiss to cite the historical fact that at the time the company went to Mexico and during the time many of the letters objected to were written, the condition of Mexico was disturbed in its political existence by the invasion and usurpation of Maximilian, who had surrendered his birthright to a crown in the Old World that he might become the founder of an empire in the New, and so successful was his effort in that direction that for more than three years the President of the Eepublic was driven from his capital in his exertions to maintain the power of the Mexican Government as a Eepublic. In that condition of affairs the communications of the superintendents of the company became important to the company at its home office in New York, and it must be assumed that in those communications the board of directors and officers of the company in New York placed the utmost confidence, and what was true during the usurpation of Maximilian as to the importance of communications was to a more limited extent true as to communications written afterwards.
The purpose of judicial investigation is to ascertain the truth and whatever tends, subject to the safeguards of legal inquiry, to establish the truth is upon every principle of legal philosophy competent to be considered by the court in arriving at a conclusion.
*494 Two grave and vital inquiries of fact arise upon tbe issues and evidence in tliis case. First, is it true, as alleged by tbe respondent La Abra Silver Mining Company, that it was driven from tbe use and possession of its mines by tbe people of Mexico and tbe authorities and that a large amount of personal property was taken from it? Second, wbat was tbe value of its property abandoned and tbe property alleged to have been taken by tbe Mexican authorities ? In arriving at a correct answer to these inquiries tbe court is to consider tbe evidence submitted to tbe commission and such competent evidence as may have been taken by either party since tbe case was referred by tbe statute of our jurisdiction. Whatever testimony or evidence there may be in tbe record from either of these sources, which tends to establish tbe truth in reply to those inquiries, is competent.
Assuming that tbe condition in Mexico, both as to tbe treatment of tbe officers and employees of the company by tbe Mexican authorities and people, and tbe value of tbe property alleged to have been taken and abandoned, is tbe gist of tbe inquiry to be made upon the evidence, is it not proper to consider wbat was written by tbe officers of tbe company to each other during tbe period in which it is alleged tbe outrages were committed and tbe property abandoned? Does tbe fact that tbe communications were intended to be private and confidential prevent their consideration in a proceeding intended to determine tbe truth or falsity of tbe alleged violence? Does tbe confidence in which they were written lessen their force as competent evidence? Tbe letters passed between tbe responsible and confidential agents of tbe company, dealing with matters within tbe knowledge and authority of both and having tbe impress of reliability. Men under such circumstances do not mislead each other.
No legal or equitable right of tbe company is violated by their use in a judicial inquiry where tbe truth is sought as to tbe alleged grievances, and no just ground of complaint can possibly exist upon tbe part of tbe respondent when its rights are determined by tbe acts and declarations of its responsible agents while in tbe discharge of their duty. Tbe recognition of tbe competency of such acts and representations do not enlarge tbe boundary of power and discretion on tbe part of tbe agent to tbe prejudice of tbe right of tbe corporation.
*495 Corporations necessarily act through the medium of agents, and the acts and statements of their responsible agents when in the discharge of their duties become in law the acts and statements of the corporation.
The respondent further objects to the introduction of the letter book for the reasons it does not contain certain letters which were' written by Bartholow, the first superintendent, before the commencement of the book, and other letters which were written by Garth and Exall and which do not appear; and upon the further ground that the book bears indications of having been mutilated, and that it is not a continuous and complete showing of all the correspondence of the officers of the company between- Tayoltita and New York. We have fully considered the grounds of objection and the arguments of counsel in support of them, and after an inspection of the book we determine that the letters of the superintendents at Tayoltita and letters from the home office, written by the officers of the company to the superintendents within their authority as agents, are competent to be considered by the court in the trial and decision of the cause.
The fact that some letters may be missing does not destroy the legal effect of others which appear in the book and which are shown to be the letters of the person purporting to have written them. Letters written by Exall to Granger after his departure for New York in the spring of 1808, and after he had ceased to be connected in fact or in authority with the mines of the company, do not come within his power as superintendent, and are not competent. Other objections were taken by both parties to the consideration of matters as evidence, but it is not practicable to note them in this connection.
The letters are introduced and admitted upon the theory that they are representations or admissions of the company. The rule is as to admissions, that the whole admission is to be taken together and the whole must be considered in determining its effect, but letters written at different times and complete in themselves can not be considered as a continuous admission, the force of which is destroyed by the omission of part.
The evidence for the respondent, which was submitted to the joint commission, was taken by Alonzo W. Adams, who was employed by the company after it was decided to prosecute the *496 claim, under a contract that he was to receive as a contingent compensation one-third of the amount awarded by the commission, and the books and evidence in the possession of Granger, who had been an employee of the company, were procured by Mexico under a contract that Granger was to be paid the sum of $3,500 in case the claim was ultimately defeated. This condition being alike to both sides, the testimony comes before the court in at least a “questionable shape.” It is insisted by counsel for the complainants that Adams, having the incentive of a large contingent compensation, was unscrupulous in his method and means of procuring testimony, while upon the other side it is insisted by the counsel for the company that Granger had every inducement to withhold testimony in favor of the company and mutilate the books which he produced under his contract for contingent compensation.
Whatever may be said as to the manner in which either performed his duty toward his employer, it may be said that the terms of the employment were not calculated to induce the most scrupulous means of investigation; and without criticism in detail, it may be said, that neither the agent of the company nor the Mexican agents are without grounds of suspicion.
TJpon the controversy of the alleged violence of the authorities and the value of the property alleged to have been taken and abandoned, it is impossible to deal in detail with the testimony. It is spread over many pages of the record in the different exhibits, embracing the extraordinary compass of more than 1,500 pages of printed matter.
As has been said in dealing with a record so voluminous in an opinion, it is only practicable to call attention to the more prominent facts as indicating the truth of the controversy, and upon the faith of those facts, taken in connection with the rest of the testimony, predicate the ultimate determination of the court.
While the company was organized for the purpose of practical and legitimate mining and not for the purpose of bringing into existence a speculative stock to be dealt in in the stock markets of the world, the testimony does not indicate that its business was managed by competent experience in mining in the person of its superintendents, and the interest of the company was subjected to the embarrassment of three changes of *497 tbe superintendents from tbe latter part of 1865 to tbe early part of 1868.
Aside from tbe experience wbicb Granger bad before bis connection with tbe company, it does not appear that any of tbe superintendents or persons in charge (except as hereafter stated) bad any practical experience either in mining or in tbe management of a business employing a large number of operatives. As to whether the business of tbe company was managed according to the best mode of development and use of such property, is among tbe controverted questions of fact arising from tbe conflicting testimony of tbe witnesses.
In this connection it is proper to cite what is said by Bartho-low in bis letter to Garth, February 6, 1866, on page 239 of Exhibit B:
“I have put our mines and mining in charge of George Cul-lins, a gentleman of much experience in mining, who has been working in tbe mines of Lower California for over two years, and I am highly pleased with bis practical good sense and sound judgment; be knows more about working a mine than all tbe rest of us put together, and he says that in his opinion, after seeing a large number of silver mines in Mexico and tbe United States, and worked in quite a number, be has never anywhere seen so good a property as this.”
In tbe same connection may be cited what is said by Exall in bis letter to Garth, dated at Mazatlan, November 17,1867 (Exhibit B, p. 312):
“To add to my further embariassment, Mr. Cullins, whose term expired on the 16th instant (since my leaving Tayoltita— I left there on the 10th for this point), intends to commence suit in tbe courts here for bis year’s salary. I am endeavoring to get him to delay proceedings until the arrival of tbe next steamer (don’t know as yet if I will succeed in getting him to delay), when I hope you will have seen necessity of acting decidedly and sending means to prosecute tbe works and pay off the debts of tbe company, or abandoning tbe enterprise at once. Nothing can be done without further expenditure of money. I am now doing little or nothing in tbe mines, and will, when I return, discharge tbe few men which are now at work in them. This I am compelled to do, as I have no money, and my stock is almost entirely exhausted, and I fear if money isn’t very soon sent some of tbe mines will become open to denouncement.
• “In my last letter I mentioned tbe amount required for immediate demands, $3,000, wbicb must be sent out. By next *498 steamer Messrs. Elder, Sloan, and Cullins, if paid off, will sail for San Francisco; if not paid off, suit will be commenced, and, as I Lave no means to defend the case, fear it will go against me. When these parties leave, the hacienda will be left almost entirely alone, there being only myself, Mr. Granger, who I am also owing, and I away much of the time.
“ What you intend doing must be done promptly. * * * The political state of the country just now is rather discouraging. I hope by the time this reaches you, you- will have received statement. Everything at the mines is as it was when I last wrote, only more gloomy in appearance, on account of not being able to employ the people and put things in operation. Please do something immediately, and inform me as speedily as possible.”
As has been said, the issue in this case is circumscribed to the allegation made in the fifteenth paragraph of the complainants’ bill, in which it is substantially alleged that the company was not driven out of Mexico by the failure of the authorities to protect it from the violence of the people, and that its property, as it had been possessed by the superintendents of the company, was worthless.
To that allegation there is a general denial by the answer of the respondent.
In the consideration of the question involved in those allegations we are compelled, without descending into details, to rely to a large extent upon what took place between the responsible agents of the company during the time it was alleged those outrages were perpetrated by the people and against which the company was not protected by the authorities of the Mexican Government. The active and responsible agents of the company during that time were the three superintendents in Mexico — Bartholow, De Lagnel, and Exall. It is not necessary to determine in this connection what the legal relations of Granger were to the company, who was placed in charge of its property by an appointment by Exall on the 26th day of February, 1868, shortly before he left Mexico for the purpose of returning to New York. Bartholow’s connection with the company commenced upon its practical organization in 1865 and continued until some time in May, 1866, when De Lagnel, as superintendent, assumed direction and control of the business of the company, who continued in its employ as such superintendent until he was succeeded by Exall in *499 April, 1867, wbo was tbe last legally constituted superintendent of tbe company.
None of these men had any experience in tbe business incident to tbe development of mines and mining ore. Their connection with tbe company lasted about two years and a half, and tbe proof indicates that they quit of their own accord and without solicitation of tbe company. Mr. Bartholow’s connection was not intended to be permanent, De Lagnel was for a year, and Exall ceased to be tbe agent of tbe company for tbe reason that its operations and results bad not been successful. Mr. Garth was tbe treasurer of tbe company from some time in 1865 until after the alleged abandonment by tbe company of its mines because of tbe alleged interference of tbe Mexican authorities.
During that time, as is shown by tbe correspondence, be was tbe responsible and practical representative of tbe company in tbe city of New York, and as such held communications with its agents in Mexico as to tbe practical conduct of its business and tbe financial condition of tbe affairs of tbe company. While other persons held the offices of president, vice-president, and directors, be assumed, by authority it must be presumed, to direct tbe agents of tbe company in tbe practical business of mining.
Tbe material allegations of tbe memorial submitted to tbe joint commission, and which are antagonized by tbe allegations of tbe bill, are, as to tbe hostility of the Mexican Government toward the respondent and tbe value of tbe property alleged to have been abandoned.
Tbe bill alleges in that connection that—
“When Garth instructed tbe superintendent, Exall, in Ms letter of July 10,1867, to be firm in maintaining bis rights as an American citizen in any difficulties with tbe authorities, tbe latter replied on tbe 6th day of October, 1867, ‘There is no difficulty about authorities, boundaries, or anything else concerning tbe mines and hacienda provided there is money on band, and money must be sent.’ That early in 1867 tbe said Garth, treasurer of said company, advised Superintendent Exall at tbe mine that no more money could be sent him by said company; that tbe draft on said company for $5,000, drawn by Superintendent De Lagnel through the Bank of California, bad been protested, and that tbe said Exall must pay tbe expenses from tbe proceeds of tbe mine; and in July, 1867, that Garth wrote to said Exall, *500 £If it costs more than it comes to, the sooner we And it out the better, and the sooner we stop the better for all parties concerned.’”
Those allegations of the bill are substantially proved by the letters from which the quotations are made, and become important in the consideration of the question as to the hostility of the people and authorities of Mexico.
Aside from the arrest of Exall, which took place some time in the early part of January, 1868, the most trouble in the conduct of the business of the company occurred in June or July, 1807, when it is alleged that the Mexican authorities took practical possession of the mines and ousted, the company from their control and direction.
It must be assumed that, whatever may be said as to the fealty of Exall toward the interests of the company growing out of his alleged connection with Granger in 1868; he was acting in good faith with the company during the year 1867 and representing its interests as became his duty as a faithful servant. As a result of that assumption, it must be presumed that he communicated to the company in New York the substantial condition of the interests of the company so far as it was affected by the acts of the people of Mexico and the failure of the Mexican Government to protect them. Mr. Garth being the agent to whom he did, as a matter of fact, communicate, and who must be assumed to have been informed to the fullest extent as to the interference of the Mexican authorities, testified before the committee of the Senate in its investigation upon the question of the interference of the Mexican authorities.
On page 164 of that examination, in answer to a question by the chairman of the committee, Garth said in substance, that he did not recollect of having written to Exall between the 10th of August and the 10th of October, 1867. As to whether between those two periods he felt any uneasiness about the property of the company, he answered: “I had other things to attend to; and, my dear sir, this was comparatively a small matter.”
On page 166, in answer to the direct question, “Well, had anything occurred within your knowledge or information at that time, August 10,1867, to convince you that that company then had a claim against the Government of Mexico?” he an *501 swered, “Not further than the general apprehensions of trouble occurring there to our employees.” And again—
“ Question. Then, if I understand you, nothing had occurred, but you had apprehensions that something might occur1?
“Answer. Yes; that was the idea.
“Question. To create a claim against Mexico?
“Answer. Yes, sir; in case we were driven out, and as this letter says.
“Question. Which letter?
“Answer. The latter part of the letter of August 10,1867. I think that letter would explain at that time my views about it.
“Question. That is the same letter from which I am reading?
“ Answer. Yes; I do not know whether you are reading from that letter — New York, August 10.
“ Question. Point out the paragraph where it speaks of being driven out of Mexico.
“ Answer. (Beading:) ‘ From the reports we get in the papers, we find that Americans and all foreigners will not be protected in their persons and rights in that country and that we may have to abandon our property there.’ Now, this thing expresses it as well as I can now. If you ask me if anything had. actually occurred there that I knew of there that I would then make a claim against the Government of Mexico, I can answer, ‘Not to my knowledge.’”
The material allegations of the company’s memorial to the Mixed Commission are, in substance, that intense prejudice existed in the public mind against Americans; that such prejudice was intensified by the belief that the United States intended to annex said States to the dominion and territory of the United States; that the agents and servants of the company were arrested'without cause, and acts of violence committed against the property of the company, which were encouraged by the authorities of Mexico; that the servants pf said company, while in the performance of their duty, were intimidated, killed, and driven out by Mexican people.
One of the alleged grievances coming within these allegations of the memorial is the arrest of Exall, which took place in. January, 1868. In connection with the arrest and imprisonment of Exall, the chairman of the Senate committee addressed the following question to Mr. Garth (p. 165):
“ Question. Now, if you had never heard of the imprisonment of your agent, Mr. Exall, before he made that report to you in New York, what reason had you for supposing that the Mexican Government had any hostility toward your company?
*502 “Answer. Well, there was talk with Mr. Bartholow and with Hardy, who had come back from there, and other people who had been employed at the mines had come back from there.
“ Question. What people?
“Answer. Why, Dr. Hardy, I. V. Hardy, and other people that I do not recollect. I think this man Gullius came there once to New York — one of the miners; and from various sources it was commonly understood tliat ilfe and property were not safe in thát part of Mexico.”
Beference is made to this examination, as it tends to show that the first knowledge of the imprisonment of Exall which G-arth had, was derived from what was told him by Exall on his return to New York, and a deduction from that fact that Exall did not regard his imprisonment at the time as an interference with the business of the company by the Mexican authorities who had imprisoned him.
In June or July, 1867 (the time being in some doubt from the inability to determine exactly the date by an inspection of the original documents), serious trouble existed at the mines of the company, originating between the officers of the company and its employees, and in which the Mexican authorities participated, as is shown by the orders made by the local authorities, appearing on page 360 as Exhibit A, marked, respectively, Y, W, X, Y. These orders have been translated by ■ agreement of parties as follows:
“Exhibit Y.
“Second Conciliating Couet oe Tayoltita.
“To the citizen superintendent of the Abra Company, present:
“ In pursuance of a communication which I received yesterday from the political chief of San Dimas, I hereby notify you that if the toorlc of the Ábra Company is not to be continued according to the system of one-third (i. e., in money), as heretofore, YOU ABE TO VACATE THE MINES at once, so that the miners may continue to work for their own account and may lose no more time.
“ Liberty and reform.
“Guadalupe Soto.
“Tayoltita, July (Junef) 4th, 1867.v
“Exhibit W.
“Second Conciliating Couet oe Tayoltita.
“ To the citizen superintendent of thé Abra Company, present:
“This court sees, to its great annoyance, that twenty-four hours have passed since it sent a communication to you, and *503 tbat you bave not deigned to answer it. Wherefore this court notifies you that you are to make a suitable arrangement with the miners as regards their work within two hours, and if they do not agree thereto you are to vacate the mines, in order that the aforesaid miners may lose no more time.
“Liberty and reform.
“ Guadalupe Soto.
“Tayoltita, June 5th, 1867
“ Exhibit X.
“Office of the Political Chief
“OF THE DlSTBICT OF SAN DlMAS.
“To the citizen representatives of the Tayoltita mines:
“It having come to the knowledge of this office that you have brought the work to a standstill in your mines—
“I hereby tell you that such was not the agreement which you made with me. I therefore think that you pay no regard to your word. If, however, you do not wish to work yourselves, give permission to the men to take ore from the mines, because I will not he responsible for the evil consequences resulting among people without employment.
“Independence and reform.
“M. Moea.
“S. Dimas, July 10th, 1867P
“Exhibit Y.
“Office of the Political Chief
“OF THE DlSTBICT OF S. DlMAS.
“To the citizen judge, Guadalupe Soto, sole conciliator of Tayoltita :
“ This office has learned with regret, through your commni-cation, what abuses are committed by those American gentlemen, who, the first time, agreed to pay their workmen entirely in coin, and the second time to pay them half and half, and the third to pay them a third part (in money). You will notify them, in your capacity as judge, by my order, that they must carry out the last agreement at least — that is to say, they must pay one-third in money. If they fail to do this they must leave the mines so that they may be loorhed by the miners to the best of their ability, for neither do the mining ordinances provide that miners may be paid entirely in goods, nor does the Government allow such abuses, and it is tired of receiving thousands of complaints on this subject.
“ You will bring the contents of this communication to the notice of the American citizen who is in charge of the mines over which you have jurisdiction.
“ Independence and reform.
“M. Moba.
“ June 3d, 1867.”
*504 July 13, 1807, is tbe date of tbe next letter from Exall to Garth (p. 307, Exbibit B):
“When I received your letter by Sr. M., I was working tbe Abra, Cristo, Luz, and Arryan, a small force in eacb.
“Seeing tbe decided manner in wbicb all further aid for tbe present was refused and tbe injunction to cut down all expenses necessitated my stopping off tbe whole force from tbe mines. As I bad only a short time previously reduced tbe cash payment from one-tbird to-(wbicb occasioned a stop for eight or ten days, wbicb I was glad of, as it was so much clear gain, and a little spat with tbe officials wbicb was gotten through without much trouble), 1 thought it best not to stop» off immediately. * * * Tbe officials are getting daily more troublesome; their demands are all foolish and very unjust, but we have to do tbe best we can with them and take things as quietly as possible.”
Tbe trouble evidently originated from a disagreement between tbe company and its employees as to tbe compensation and mode of payment — a condition wbicb often arises in the best-governed communities of every country, and is one of tbe most delicate and troublesome subjects to be dealt with upon tbe part of public authorities. In tbe troubles incident to tbe disagreement, the Mexican authorities failed to protect tbe officers and tbe rights of tbe company to the extent they were entitled to, but that such failure was for tbe purpose of driving tbe company away and getting possession of tbe mines does not appear, as alleged by tbe respondent.
It seems that tbe trouble, for tbe time being, at least, was amicably arranged, as will be seen by the letter bearing date July 11,1867, from Exall to tbe political chief of San Dimas, in wbicb be says (p. 303, Exhibit B):
“ Your letter of tbe 10th instant was received last evening, and from its contents I thought that no answer was expected, and I bad no intention to reply to it. This morning I was advised that tbe answer was expected by you. In respect to tbe compromise of wbicb you spoke, it was made while I was in Mazatlan, to last until I should return, and then I was to arrange with you as best I could, and if you bad known tbe circumstances and causes wbicb led to the paralyzation of tbe works it would have been apparent to you that it was not possible to do otherwise. I have offered to the operatives all tbe mines, to be worked on shares by tbe carga, and some are already -at work; and desiring that with this there may be tbe most friendly understanding about the affair, I am your most bumble servant.”
*505 An argument was made in tbe trial of the cause as to the law and custom of Mexico in relation to mining', which gives to miners under the direction of a court the right to work a mine upon certain conditions; but the law and custom are not in evidence, and we are unable to perceive by what right of judicial authority the orders by the jefe politico were made.
While the orders of the local authorities indicate a failure to discharge the functions of the Government in the protection of property, the interference of the authorities and the illegal ■ orders of a court do not seem to have impressed the agent of ■ the company with the seriousness in which they were regarded by the officers and agents of the respondent after the commencement of proceedings to recover compensation founded upon alleged failure to protect its rights. The letter written on the 13th day of July, 1867, which evidently refers to the troubles in which the orders were made, lays no stress upon the act of the authorities as such an interference which prevented the subsequent conduct of the business of the mines.
The above seems to have been the last communication between the parties with reference to the trouble occurring about that time. In this connection it is proper to note that the umpire, in passing upon the questions submitted to him, said, in substance, that the superintendent took such steps as he could to obtain protection from the authorities, but finding his efforts in vain he appealed through a lawyer of high character to the highest authorities in the State, who declined to interfere in the matter. As applicable to that statement, the deposition of Mr. Chavaría may be referred to. By his deposition it is shown that sometime in July or August, 1867, he was at the mines of the company at Tayoltita and had communication with the local authorities of Mexico, and that as a result of his being in communication with Exall at that time he was employed to solicit from the State government of Durango protection for the company; that he made application to the authorities of the State of Durango for that purpose, but it availed nothing. The only answer given was that the government of the State would not interfere in private matters.
His deposition tends to show that great prejudice existed in the minds of the people against the company, and that that prejudice was participated in by the local authorities.
*506 On July 10, 1867, Garth writes to Exall a lengthy letter (Exhibit B, p. 320).
* # # * * * *
“Don’t run into debt or get into difficulty with the authorities, if there are any such things existing; but at the same time be firm in maintaining your rights, and don’t submit to imposition except by force, and then make a legal and formal protest as a citizen of the United States and as an American company duly organized and prosecuting a legitimate business under the protection of the law, and our rights will be protected by our Government.”
He also said in the same letter:
“I am glad to hear that you are taking out rich metal, and hope it will turn out valuable. It seems almost incredible that all parties should have been so mistaken in the value of the ore now on the “patio,” and I don’t see how it is that Mr. Cullins and Mr. Sloan, old and experienced miners as they are, as well as the old Mexican miners, should have been so deceived as to the value of the ore. * * * Of course you keep an accurate account of the cost, not only of raising and transporting the ore to the mill, but of the cost of crushing it and converting into coin or bullion; and, as it is a matter of simple calculation, you can soon see if it will pay or if it is a losing business. If it costs more than it comes to, the sooner we find.it out the better, and the sooner we stop the better for all parties concerned.”
# # # * * # *
De Lagnel, who was the second superintendent, and whose agency commenced in May, 1866, and continued until 1867, and who is one of the few witnesses who has escaped severe criticism in this case, gave his deposition on July 9,1894. He was not examined in the proceedings before the joint commission and the reason assigned by the company for its failure to examine him is that by the exercise of diligence they were unable to find him. That excuse is severely contested by the complainants. It is not important that that issue be settled in this connection.
The substance of his deposition on the subject of disturbances is that the country during the time of his agency was disturbed by Imperialists and Liberalists, and that the forced loan was the nearest approach to violence; as to the demonstrations made by workmen, he speaks of a general feeling on the part of the people expecting an attack; speaks of civil authorities; little dealing with them; had to get permission or *507 stop mines; bad no trouble in getting extension; never came in personal contact witb Soto, the jefe politico, “except when I wrote.” “I relied upon myself for protection;” wild country; saw no authorities or exhibition of authority from one year’s end to another; armed demonstration described before Senate, because Mazatlan was beleagured by Liberalists. French Imperialists had possession, and the general would not permit passage; speaks of armed demonstration; should not have known there was any trouble except for the clerk hearing the men talking in low tones. “ The man who seemed to be the ringleader didn’t say a word to me. Mr. Saius said to me, ‘If you are going to do anything, you had better do it quickly, because this man is talking very ugly and is inciting these men to make an attack upon you.’ ”
In this connection it may be said that by the exhibition of great nerve on the part of Colonel De Lagnel serious trouble was averted.
Iu a letter dated January 5, 1867 (p. 294, Exhibit B), of De Lagnel to Garth, he says:
“I could not under any circumstances or for any consideration consent to remain longer than the period contracted for. I desire to do rightly in all things; but regard for myself and my immediate family demands that I should be elsewhere as soon as possible.”
On page 30 of Exhibit 2, De Lagnel is asked the following question:
“Question. Now, was there any interference during your superintendency of the company by the military authorities with the operations of the company1?
“Answer. Only in that one instance about that forced loan, and they never appeared on the place then; they never came nearer than San Dimas.
“ Question. That was the nearest approach to interference by the military authorities4?
“Answer. Yes'.”
One of the grievances complained of on the part of the company is what is known as forced loans, and which are referred to in the opinion of the umpire as an indication of the hostility of the Mexican authorities. By reference to Exhibit Z (p. 360 of Exhibit B) it will be seen that on the 27th July, 1866, a demand was made upon the offi cers of the company for the sum of $1,200 by Valdespino, who was in command of the forces *508 of the Liberal Government near tbe mines of the company. When that demand was made on De Lagnel, he was advised by a Mexican who had been in the Liberal service that unless he complied his place would be sacked; to which De Lagnel said, (í I haven’t the money, in the first place, and if I had I would not pay it;” and as a result of that determination De Lagnel states that he sent them a few goods and wrote a courteous note to one of them expressing regret that he could not comply with their wishes. They wrote him an acknowledgment and sent a receipt for the goods, and that was an end of it.
In connection with the subject of forced loans may be quoted the letter of Bartholow in Exhibit B (p. 251), in which he protests against illegal exactions in the form of onerous taxes, and threatens if the exaction is enforced that he will be compelled to discharge the miners, mechanics, and laborers, and leave the country until such time that security and protection could be obtained from the Mexican Republic. In the same letter he enters his protest against the collection of illegal taxes and speaks of an appeal to his Government at Washington.
Some of the principal matters relied upon by the company in showing the interference by the Mexican authorities with the agents and officers of the company are the alleged robbery of Scott, the murder of Grove, and the imprisonment of Exall.
Shortly after the murder of Grove occurred, as is claimed, the robbery of Scott happened, as given in Bartholow’s testimony before the commission (Exhibit A, p. 477), in which he says in substance:
“I recall the amount taken; I entered it upon the books of the company, charging the same to robbery account, where other prestamos and robberies were entered. The name of the employee was Robert Scott, and in addition to the several prestamos levied and enforced by the military authorities, which I said ranged from $300 to $600.”
In Bartholow’s letter to Garth, April 10, 1866 (Exhibit B, 255), it is in substance stated, that in consequence of the unsettled state of the country he has great trouble in getting-money transported to pay hands and other expenses, but that his efforts to transport money had been successful, except in one instance, and then he states the instance as occurring with Scott, substantially as follows: I gave him a check for $1,000 *509 to bring- up; besides tbis he had some money outside of this sum, which was left after paying the taxes in San Ignacio; he got the money as directed and started to overtake a train which was bringing supplies, and when out about 20 miles from the port six or eight armed men sprang upon him, ordered him to dismount, and robbed him of $1,178 in money, his pantaloons, and boots. He immediately informed the nearest commander of the Liberal forces, who sent for him to identify the robbers; he complied, but could not find them for the reason that the officer could not find half his men.
“I also at the same time opened a correspondence with General Gorrona through the prefect, Gol. Jesus .Yiga, at San Ignacio, who, by the way, is, I think, one of the most perfect gentlemen I have met in the country, and I am of opinion that but for the turn in military affairs which occurred a few days since, we would have in some way or other been reimbursed for the loss; but now I have no hope whatever, and we may as well charge up $1,178 to profit and loss.”
Another marked grievance is the alleged murder of Grove, whose death was detailed at considerable length in the testimony of witnesses whose depositions or affidavits appear in the proof before the joint commission on page 364 of Exhibit A. It is said by John Oole, one of the witnesses for the company, that in 1867, between Mazatlan and San Dimas, captures took place there several times in 1866 and 1867; and that on one occasion one of the officers, an American, in charge of the mule train, was killed by the Mexican troops for attempting to defend the property in his charge. He was quartermaster of the train at the time. Other witnesses, including Exall, testify as to the death of Grove by violence at the hands of the Mexican authorities while in charge of the mule train of the company. Bartholow, the first superintendent, also testifies in substance that Grove was murdered while in the discharge of his duty as a custodian of the mule train of the company, and the consequent loss of 150 mules.
On March 7,1866 (p. 247 of Exhibit B), is a letter of Bartho-low to Garth, in which he gives a detailed statement of the circumstances of the death of Grove, the substance of which is, that in his last letter to Garth he had mentioned the absence of Grove and his fear that he was murdered; that since the date of his last letter his worst fears have been realized and the body of Grove discovered. He says in substance that his *510 pistol and clothing have not been found nor has his mule turned up, but he hopes it will. States that he has placed the fact of the death of G-rove before the commander of the Liberal troops, who took great interest in the matter and promised to use his best efforts to bring the offenders to justice, and if found they will be tried by court-martial and summarily executed if found guilty. The letter is quite lengthy, but the substance of it may be stated as follows: That Grove lost his life by his imprudence; that the night previous to his arrest was passed at the house of a man of bad reputation; that Grove gave him to understand that he had $4,000 in money, and that as a result of that communication he had been murdered.
In another letter (p. 256 of Exhibit B), after stating that he fully wrote him in his last letter, he proceeds to state that the Liberal troops have arrested the murderer of Grove; that the villain was in the employ of the company at the time of the murder; that he was tried for the murder of Grove; that they failed to convict him of Grove’s murder, but did convict him for the murder of a woman some time before; that before his execution he confessed to the murder of Grove and revealed the names of his confederates; that these confederates would have been arrested had not the Liberals been driven from the country.
One of the most important allegations of the bill (which is in denial of one of the allegations of the memorial) is “ that the superintendent was not imprisoned, but was only told to consider himself in arrest at his own hacienda for alleged contemptuous treatment of a judge, and that he straightway complained to the prefect, after which no further restraint was imposed upon him.” This allegation is in reference to Superintendent Exall, and becomes important for th,e reason that he was at the time the representative of the company in charge of its property and directing its business. The evidence is not very clear as to the exact date of the arrest, nor is it very satisfactory as to the extent of the arrest by the magistrate, Perez. Whatever may have been the purpose of Perez in doing what he did in reference to Exall, it is indicated by the testimony that the immediate cause of his arrest grew out of and was dependent upon an insult which Perez says was offered to him in the store of the company.
*511 It seems that Perez, according to tbe statement of Exall, went to a place in the store where he had no right to go; he was ordered by Exall not to remain; he became very angry and arrested Exall for such indignity. It is a theory of the company that the purpose of Perez was to interfere with the control of the company over its property, take possession of it, and thereby drive the company from Tayoltita and the posses: sion of its property. It is a theory of the complainants that the trouble between Exall and Perez had no greater significance or consequence than a quarrel between individuals, and had no reference to the rights of the company.
Exall, in his deposition taken in 1869, and appearing on page 337 of Exhibit A, says in substance: I was arrested by order of the local magistrate, put into prison, sentenced to pay a fine of $50 and imprisonment for two months; had no trial or examination; did not know why I was arrested; I committed no act, crime, or offense; released through the personal influence of Granger, who promised payment of the fine; protection was denied me. On 7th January, 1868, he applied to the jefe politico at San Dimas in a long communication, in which he detailed substantially the same facts as stated in his deposition except as to his imprisonment. It does not appear that the jefe politico did anything. There is very sharp controversy in the testimony, and was in the argument of the case, as to whether his imprisonment was nominal and technical or whether it extended through a period of many days. It is insisted by the complainants’ counsel that it was merely nominal and by the respondents’ counsel that it was substantial, and in a loathsome place of confinement.
The imprisonment complained of by Exall is the samé imprisonment about which Garth was examined in the investigation before the Senate committee. There is no dispute about the fact that by the intervention of Granger Exall was relieved from imprisonment, whether it was constructive or actual. The books of the company show that on the 7th day of January, 1868, a charge was placed upon the books of $50, which, as it is insisted, refers to what was paid by Granger. The alleged imprisonment of Exall, coming as it did within the general allegations of the memorial, and which is denied by the allegations of the complainants’ bill, has assumed a grave importance in the decision of the question of fact, as to whether the com *512 pany was compelled to abandon its mines in consequence of the acts of the authorities of Mexico.
It does not appear from the evidence in the case that after the imprisonment of Exall, which must have been about the 7th or 8th of January, 18C8, there was any change in the condition of the property of the company from that time until the 20th of March, 1868, except that on the 26th of February Exall placed Granger as superintendent in charge of the affairs of the company and the possession of its property. At the time Exall was ordered to report at the house of Perez under arrest there was great excitement in the crowd which gathered in consequence of the arrest, but it does not appear that any actual violence was committed by any of the persons in the crowd.
January 24,1868, is the first communication by Exall to Garth after his imprisonment on the 7th or 8th of January preceding. That letter is dated Mazatlan, and in which he says:
“ I came down to meet the steamer from San Francisco in hopes of receiving letters from you. I received none, and now, being entirely out of funds and stock, and being sued by agents from Bank of California for the payment, have to let things take their own course, as I am unable longer to protect your interests here. * * * I am doing nothing whatever at the mines, and can not until I receive money to operate with. I haven’t means to protest now, and they are liable to be denounced at any moment. * * *
11 By December steamer I sent you a telegram from San Francisco; no reply. * * * I am owing considerable, and no means of paying. What is your intention? Is it to let your interests here go to the dogs? You have either to do this or send money out to protect them. If by next-steamer I receive no assistance from you, I intend leaving for the East. I will go by way of San Francisco; will from there telegraph you what further steps I shall take. I have been doing everything in my power to keep the Bank of California from getting possession; thus far have succeeded, but can prevent them no longer, and fear they will eventually have their own way. * * *
“ I have only one man with me now; am compelled to keep someone. Please telegraph me * * * on receipt of this. You can judge by what has been done in New York and sent to me whether or not I may have left.” (Exhibit B, p. 317.)
Garth in his examination before the committee says he has no recollection of receiving that letter.
*513 This letter of January 24 seems to be the last one written by Exall to Garth, as appears from Exhibit Bi The first letter written by Garth to Exall was on May 10,1867, in which he says:
“We now expect by the next steamer, now nearly due, to see Colonel De Lagnel or to hear something further from him or you. In our former letters we stated that in the event of his leaving Mexico we supposed that you would take charge of affairs; since when we have given no further instructions on this point. * * * The affairs of the company here are much embarrassed; a few of the directors have advanced all the money to carry on the operations and have been nearly ruined by it, and are not able to afford any further aid from here and look anxiously to be reimbursed very soon from the products of the mines, and it is hoped that your best energies will be exerted to afford relief.” (Exhibit B, p. 318.)
On the 1st of May, 1878, Exall made a statement under oath as to the letters purporting to have been written by him, in which he attempts to explain and qualify the substance of -what he said in the letters. The statement was made at the instigation of the attorney of the company because of the use which was being made of the letters in what is known as the “ Slaughter pamphlet.” In taking the testimony the counsel of the complainants objected to the statement of Exall as incompetent, but it was referred to and commented on in the argument of the case, as was the Slaughter pamphlet. In the absence of a concession on the part of the complainants as to the admission of the Exall statement, it would not be competent, being ex parte and made long after his connection with the business of the company had ceased.
It is'not necessary to discuss the character of the agency, contract, and pamphlet written by Slaughter in the preparation of the claim of Mexico; and while they may be justly liable to severe criticism, the rights of the respondent must be •determined, as they are founded on the substantial and important facts as they exist in the proof and as they are affected by the law.
Bartholow, in his deposition taken June 24,1874, speaks of the capture, applied to General Gorrona to restore the property, implored protection. His testimony on this point is in substance:
He referred me to the commanding officer. I visited him. I told him the circumstances attending the capture and robbery,
*514 He said lie bad no authority to indemnify'the company. I requested protection. (P. 476, Exhibit A.)
He also states that the amount of cash prestamos levied and enforced during his superintendency amounted to a little more than $3,000, and the value of mules and supplies taken from the company by the military not less than $25,000. “It is not true that the company ever had protection from any of the Mexican. authorities, either national or local, nor any offer of protection when applied for by me and other officers under my superintendency.” He speaks of the conspiracy, headed by Manjarez, to drive him and the employees out of the country.
Manjarez admitted that he was one of the ringleaders of the mob organized to kill and drive out the company, but that he was led into the conspiracy. He was in the employ of the company at the time, and was discharged by Bartholow. He testifies'that the superintendents and subordinates of the company were qualified for their positions by knowledge of the science and practice in mining operations; that the work was • conducted skillfully; that the machinery was good. The property of the company was worth $3,000,000, provided they had been protected by the Mexican authorities.
On March 17, 1866, Bartholow wrote to the administrator of rents, protesting against the imposition of onerous taxes, in which he says:
“If such a tax as this is imposed upon me, I desire General Comma to send here an officer empowered with written authority to take of my effects sufficient to pay it, for I shall, if anything like this sum is demanded of me, put my goods and property under the protection of the flag of the United States, and from under it I intend they shall be taken.” (P. 251, Exhibit B.)
Special references are made to the letters of superintendents, treasurer, and certain parts of the testimony of witnesses, for the reason that in the opinion of the court they have a very important bearing upon the condition of the company as it was affected by the acts of the people and the Mexican authorities.
The testimony offered on the part of the complainants in the different exhibits embraces the testimony of a large number of witnesses, some of whom were examined in the form of ex parte affidavits and used before the Commission; others in Exhibit O were examined in the ordinary mode of taking depo *515 sitions, and tbe testimony in Exhibit E embraces tbe examination in tbe Senate The testimony of tbe respondents in Exhibits A and D embraces tbe testimony of a large number of witnesses whose testimony is in tbe form of ex parte affi-* davits in Exhibit A, and tbe testimony of a number of witnesses taken in tbe regular manner and embraced in Exhibit D make a record of evidence entirely too large, as has been said, to be dealt with in an opinion.
Tbe cause was most elaborately argued in briefs and in court by tbe very best counsel upon both sides, exhibiting- a most wonderful knowledge of tbe details of the evidence; it was then reargued, in consequence of tbe death of tbe late Chief Justice, even more elaborately than in tbe first trial, and by equally competent and able counsel and examined by tbe court, so that its details of facts, its principles of law, and contention of parties are familiar to tbe mind of tbe court, and as a result of that discussion and examination we have arrived at tbe conclusions of fact and law herein announced.
Exhibit A, which contains tbe testimony before tbe Commission, is m tbe form of ex parte evidence on both sides, and an examination of it will disclose tbe extraordinary range of inquiry and statement and tbe large number of witnesses. Tbe most of it was taken by Adams under bis agreement with tbe company, and tbe different persons as agents who represented tbe Mexican Government. It is no exaggeration to say that few cases in tbe history of judicial controversy have exhibited such a mass of testimony, competent and incompetent, .covering tbe examination of nearly one hundred witnesses. Witnesses contradicting each other and sometimes contradicting themselves are tbe marked characteristics of tbe record in this case.
This being a proceeding in equity, this court is not (sailed upon to settle tbe facts by tbe finding of ultimate facts for tbe consideration of tbe Supreme Court, but tbe whole record is transmitted to that court, and tbe case is to be determined in tbe Supreme Court upon tbe law as it shall be adjudged and upon tbe facts as they shall be found by tbe decision of tbe Supreme Court.
That would be so in a case of this kind arising under tbe ordinary jurisdiction of tbe Court of Claims, but it is especially *516 true from tbe provisions of the statute giving us the special jurisdiction to determine the issues of this proceeding. The statute provides for a decree, and not for a money judgment. In the case of Harvey v. United States (105 U. S., 671) it is said:
“The rules touching the effect of the findings of fact by the Court of Claims do not apply to the hearing on appeal from its adjudication on a claim whereof it took cognizance under a special act of Congress, which requires it to exercise equity jurisdiction. This court, on such an appeal, must determine the facts as well as the law applicable thereto.”
All the testimony being before the Supreme Court for the purpose of settling ultimate facts from such testimony, we have confined the limits of this opinion to questions of law, and the determination of the ultimate fact which is, whether the company was compelled to abandon its mines because of the acts of the people of Mexico and the Mexican authorities.
The undisputed facts may be briefly stated as follows: The La Abra Silver Mining Company was duly incorporated by the legislature of blew York for the purpose of carrying on the business of mining in Mexico in the year 1865. It purchased a number of mines, took possession of them, and proceeded to develop them by the outlay of a large amount of capital. It continued in the possession of its mines for mining purposes during the latter part of 1865, 1866, 1867, and part of 1868. During those years it mined a large quantity of ore, but did not beneficíate it to any considerable extent. On the 20th of March, 1868, Exall, who was its last legally appointed superintendent, quit the possession of the mines, first having turned them over to Granger, as custodian for the company. Exall arrived in New York some time in April, 1868, and the company paid no further attention to the mines and did not attempt to exercise any control over them or assert any claim to them after the departure of Exall.
After the return of Superintendent Exall to New York, which was some time in April, 1868, nothing was done by the company in asserting its rights until notice by the attorneys of the company to the Mexican agent of its claim on November 30,1869; notice to the Department of State, March 17,1870, and the presentation of the claim to the Commission, June-14,1870. After the abandonment of the property of the company, which *517 is alleged to have been on tbe 20th March, 1868, nothing was done with it, except in so far as it was superintended by Granger, who, as it is insisted, was put in possession of the property of the company without legal authority, he having been designated by Exall on the 26th February, 1868.
It does not appear that any effort was made on the part of the company or any of its officers to bring to the immediate notice of the United States the alleged fact that it had been driven out of the territory of Mexico by the violence of the public sentiment of the people and the failure of the Mexican authorities to protect it in the possession of its property before the notices to the State Department on the 17th March, 1870.
Although the company is not estopped by its failure to assert its rights before that time in bringing to the notice of its own Government the alleged outrage upon its rights, as ultimately asserted in its memorial to the Commission, such failure maybe properly considered in the determination of the questions of fact material to the correct decision of the principal issue made by the pleadings in this proceeding.
The treaty under which the Commission convened, the fact of its meeting on the 81st of July, 1869, were matters of legal and public notoriety, which could not have escaped the attention of persons interested in the property rights of the company, its officers and attorneys; and in view of that it becomes one of the strange incidents of this controversy that the presentation of the claim, involving more than $3,000,000, should have depended upon what may be construed a casual meeting between Garth and one of the original attorneys'in the city of Washington in the autumn of 1869. Aside from the indistinct recollection of Garth that he may have heard of the opportunity to present and litigate the claim before that time in a letter from Bartholow in the fall of 1869, it does not appear that it had occurred to any responsible agent of the company to assert its rights in the form of a diplomatic claim against the Mexican Government.
The evidence shows that the legal rights of the respondent, from their inception up to and including the presentation of the claim to the Mexican agent and the preparation of it for the consideration of the Commission, were in the care of a gentleman of standing at the bar, fully aware of the legal rights *518 of tlie company growing- out of tbe charges made in the memorial upon which the rights of the respondent were adjudicated against Mexico.
The evidence shows that the responsible agents of the company in Mexico at the time of the perpetration of the alleged abuses by the Mexican authorities, were not wanting in a firm reliance on the ability and duty of the United States to protect them in the possession and enjoyment of their rights as citizens of the United States in the territory of Mexico.
Bartholow and De Lagnel resisted with ñrm. determination the encroachments and threatened encroachments upon the rights of the company, as they were advised to do. from the home office in New York, invoking the presence of the flag of their country, and giving notice to the Mexican authorities that they would appeal to the Government at Washington in case certain demands were enforced.
That being the spirit of the respondent’s agents at the time of the alleged invasion of its rights and threatened expulsion from the country, it is somewhat strange that after such expulsion was accomplished, as it is claimed, the officers and agents of the company should be slow in asserting an appeal to their own Government and the tribunal organized for the purpose of redressing such grievances.
In the consideration of the question as to whether the company was driven from its mines by the acts and failures of the Mexican Government, it is proper to consider what it did after the alleged abandonment (as incident to such acts and failures) in coming to a conclusion upon the question as to whether it was compelled as a matter of fact to abandon its mines because of the acts of the Mexican authorities, and whether the acts complained of were sufficient to cause or compel them to such abandonment. The subsequent course of the company through its officers and agents tends to construe from its own standpoint the condition of the company in Mexico as affected by the acts of the Mexican Government.
From the extended range of the testimony, the very able briefs and arguments made on either side by the counsel, extending over mauy pages, and elaborate oral presentations of the cause, there are evolved two plain issues of fact.
It is asserted in substance by the company in the terms of the memorial that it was seized and possessed of valuable sil- *519 Ter mines in Mexico during tbe years 1865, 1866, 1867, and 1868, and while so possessed the Mexican people and Mexican authorities, by their violence and unlawful interference, compelled it to abandon those mines.
It is averred by the bill in substance and contended by complainants that the mines were worthless; that the company was not compelled by the acts of the Mexican people or the Mexican authorities to abandon its mines, but upon the contrary they were abandoned because they were unproductive, and that therefore the award obtained through the medium of the Mixed Commission was procured by fraud effectuated by means of false swearing and the subornation of witnesses and other false and fraudulent practices. The respondent denies those allegations in substance, asserting the original averments of the memorial.
Under the Act of June 18, 1878 (20 Stat. L., 144), the Hon. William M. Evarts, Secretary of State, in a report to the President stated that the evidence presented by the Eepublic of Mexico brought into grave doubt the truth of the testimony as to the amount of damages suffered by the company, and that the honor of the United States required further investigation of the claim, and in that connection said:
“It may be that, as the main imputation in the case of the La Abra Silver Mining Company is of fraudulent exaggeration of the claim in its measure of damages, it may consist with a proper reservation of further investigation in this case to make the distribution of the installments in hand.”
Upon a renewed examination by the Secretary he became confirmed in the opinion that the limits of a further investigation should be confined to the question of a fraudulent exaggeration, and as a result of that opinion that, consistent with the honor and duty of the United States, a distribution might be made of the installment then received, reserving the question as to later installments.
In pursuance of that diplomatic policy, founded upon the showing then made by Mexico, and the belief that the rights of Mexico could be preserved consistent with the honor and duty of the United States by confining the question to the “ main imputation” of “fraudulent exaggeration,” the distribution was made reducing the fund of the award to the sum of $403,030.08, which is now the amount subject to the decree of this litigation.
*520 At the time the Secretary of State made the order of distribution Mexico had exercised the diligence which resulted in the procurement of the books of the company, and which might have been procured for use before the joint commission by the exercise of like diligence. Upon th at, tak en in conn ection with the fact that the “main imputation” was fraudulent exaggeration, the Secretary made the order of distribution. Aside from the eminent ability of the Secretary to deal with a question of grave and delicate diplomatic responsibility,it may be said that, under all the circumstances of the situation, it was a wise course to pursue toward the interests of both parties and the responsible agency of the United States.
The purpose of the complainants in filing the bill and the object of the enactment of the law were to determine the question as to their duty in relation to the money still on hand and undistributed as the proceeds of the award. The statute contemplates that the effect of the decree be confined to the money on hand, and to that extent it partakes of the character of a proceeding in rem. It was no fault of the complainants that the award was obtained and the consequent payment of all and distribution of part of the money, exercising, as they did, the wisest and best precaution suggested by the circumstances to protect the interests of Mexico, and yet discharge toward the citizen the delicate and responsible duties of a sovereign.
The complainants having charged in the bill that certain affidavits used before the Commission are false and procured by fraudulent practices on the part of the company, the failure of the complainants to procure the testimony of such witnesses contradicting the affidavits is insisted by counsel to be material and important; but such failure can only be considered as important in the consideration of the original affidavits and does not affect the rights of the complainants if upon other grounds and by other testimony they are entitled to a finding in accordance with the allegations of the bill. The testimony taken since the filing of the bill is contained in Exhibits C and D, consisting of the depositions of six witnesses for complainants and four for the respondent. While it is important in the consideration of the case, it is not necessary in the opinion to make reference to it beyond what has been done.
The court, upon an examination of all the testimony, excluding such portions of it as in the opinion of the court are not *521 Competent, determines as a conclusion of fact that the La Abra Silver Mining’ Company did not abandon its mines in Mexico because of the interference of the people of Mexico and the public authorities of the Mexican Covernment, or either, but on the contrary that it abandoned its mines because they were unproductive and for the want of money to operate and work the same, and that the award made by the United States and the Mexican Mixed Commission in respect to the claim of the said La Abra Silver Mining Company was obtained as to the whole sum included therein by fraud effectuated by means of false swearing and other fraudulent practices upon the part of said company and its agents, and a decree will be entered barring and foreclosing all claim in law and equity on the part of said company, or its agents, attorneys, and assigns, to the money received from the Republic of Mexico for or on account of such award.
Having decided that the company was not compelled to abandon its mines because of the acts of the people of Mexico, unrestrained by the Mexican Government, and that it was not compelled to abandon the mines because of the unlawful interference of the Mexican authorities with the property and business of the company, it is not necessary to consider the question of the value of the property of the company at the time of the abandonment.
A decree will be. entered in accordance with the conclusions reached in this opinion.